No. 25-40247

IN THE

# United States Court of Appeals for the Fifth Circuit

RICHARD ANTHONY HEROD,

*Plaintiff–Appellee,*

v.

ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION.

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Southern District of Texas, Galveston Division
Civil Action No. 3:15-cv-0338

## BRIEF OF APPELLANT ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

JOSEPH P. CORCORAN*
Deputy Chief
Criminal Appeals Division
State Bar No. 00793549
  *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
joseph.corcoran@oag.texas.gov

*Counsel for Defendant–Appellant*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Counsel for Defendant–Appellant*
   Joseph P. Corcoran
   Assistant Attorney General
   OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Plaintiff–Appellee*
   Richard Anthony Herod

*Counsel for Plaintiff–Appellee*
   Jonathan Landers
   ATTORNEY AT LAW
   917 Franklin Suite 300
   Houston, TX 77002
   JLanders.Law@gmail.com

                                        s/ Joseph P. Corcoran
                                        JOSEPH P. CORCORAN
                                        Assistant Attorney General

## STATEMENT REGARDING ORAL ARGUMENT

The district court conditionally granted habeas relief on two of Plaintiff–Appellee's claims. Although the underlying legal errors are obvious under existing precedent, the Director requests oral argument because he believes it could significantly aid the decisional process in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................... ii

TABLE OF CONTENTS....................................................................iii

TABLE OF AUTHORITIES..............................................................viii

INTRODUCTION................................................................................1

JURISDICTIONAL STATEMENT .....................................................2

STATEMENT OF THE ISSUES.........................................................3

STATEMENT OF THE CASE.............................................................4

    I.    Trial Evidence............................................................................5

        A.    In the late evening hours of January 7, 2010, Holly Kelly drove Herod and another man to Ronnie and Alissa's home. ....................................................................................5

        B.    After Herod and Salinas exited the truck, they invaded the Gallagher's home. ...........................................................7

        C.    The "white" assailant called Alissia the day after sexually assaulting her.........................................................13

        D.    Cellphone evidence corroborates Alissia's testimony that the man who called her also sexually assaulted her the previous day.................................................................13

iii

E.     DNA evidence .................................................................15

II.    Procedural History ........................................................17

A.    Herod is convicted of aggravated sexual assault and aggravated robbery. ...................................................17

B.    Direct appeal ..............................................................17

C.    Herod pursues his first state habeas challenge. ............18

D.    Herod files this federal habeas petition below...............18

E.    Herod returns to the State courts to file a subsequent state habeas application. ..................................................20

F.    Herod returns to federal court ...........................................21

STANDARD OF REVIEW ....................................................21

SUMMARY OF THE ARGUMENT ....................................22

ARGUMENT ..........................................................................24

I.    Herod's *Napue* and *Brady* Claims Were Procedurally Defaulted in State Court.................................................24

A.    The legal standard for procedural default and its exceptions ......................................................................24

B.    The Director affected a limited concession of "cause" below. ....................................................................26

iv

C.    The district court erroneously found prejudice to excuse the default. ................................................................26

    1.    The non-DNA direct and circumstantial evidence powerfully establish Herod's guilt. .................................27

    2.    Browder's DNA testimony was relatively insignificant in establishing Herod's guilt. ..........................................29

II.  Alternatively, Herod's *Brady* claim is totally without merit. 30

A.    Legal test for *Brady* ...............................................30

B.    Herod failed to show the State "suppressed" evidence. ..............................................................................31

    1.    The Director did not concede *Brady* suppression below. ...................................................................33

    2.    Even if the Director conceded that the State "suppressed" evidence, it was error for the lower court to grant habeas relief where Herod fails to show *Brady*-suppression as a matter of law. .......................................37

    3.    The State could not have "suppressed" evidence of DPS's newly available, post-trial DNA mixture result that excluded Herod as a potential contributor to the white shirt. ..............................................................40

    4.    The State could not have "suppressed" the forensic scientific debate concerning the DNA mixture protocols used at the time of trial by labs throughout the country. ..............................................................42

5.    The State could not have "suppressed" evidence that its testifying DNA expert calculated the CPI for the white shirt using a "suspect-driven bias." ................... 48

D.    The district court erroneously found that Herod established *Brady* materiality ............................................. 50

E.    The district court violated *Teague v. Lane* by fundamentally altering *Brady*'s suppression prong ...... 51

III. Alternatively, Herod's *Napue* claim is without merit ........ 52

A.    Legal standard under *Napue* ............................................. 52

B.    Herod failed to show that Browder's testimony was actually "false." ....................................................... 53

C.    The prosecution did not actually known that Browder's testimony was "false." ............................................. 57

1.    Neither Browder nor the prosecution were aware that that Browder's testimony was "false" at the time of trial. ................................................................. 57

2.    The lower court erroneously determined that the prosecution need not have actual knowledge of falsity. ................................................................. 59

3.    The district court improperly imputed DPS's alleged knowledge of the falsity of Browder's testimony to the prosecution. ....................................................... 60

D.    The district court erroneously found that Herod established *Napue* materiality ............................................. 63

**E.    The district court violated *Teague v. Lane* by fundamentally altering *Napue*'s legal framework.** ......... 63

**CONCLUSION** ........................................................................ 63

**CERTIFICATE OF SERVICE** .............................................. 65

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT** .................................................................................. 65

**ELECTRONIC CASE FILING CERTIFICATIONS** ......................... 66

# TABLE OF AUTHORITIES

**Cases**

*Austin v. Davis*, 876 F.3d 757 (5th Cir. 2017) ................................. 22, 33

*Black v. Collins*, 962 F.2d 394 (5th Cir. 1992) ........................................ 60

*Brady v. Maryland*, 373 U.S. 83 (1963) .............................................. 1, 30

*Brogdon v. Blackburn*, 790 F.2d 1164 (5th Cir. 1986) ........................... 41

*Burgess v. Terry*, 478 F. App'x 597 (11th Cir. 2012) .............................. 41

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) ................................ 53

*Cano v. Williams*, No. 21-1214 (10th Cir. Apr. 15, 2022) ....................... 39

*Coleman v. Thompson*, 501 U.S. 722 (1991) ..................................... 24, 25

*Cone v. Bell*, 556 U.S. 449 (2009) ........................................................ 50

*Davila v. Davis*, 582 U.S. 521 (2017) ................................................... 24

*Edwards v. State of Louisiana*, 496 F.2d 904 (5th Cir. 1974) ................. 2

*Estelle v. McGuire*, 502 U.S. 62 (1991) ................................................ 39

*Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997) ...................... 21

*Fearance v. Scott*, 56 F.3d 633 (5th Cir. 1995) ...................................... 24

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ..................................... 30

*Giglio v. United States*, 405 U.S. 150 (1972) ................................... 52, 62

*Graham v. Collins*, 506 U.S. 461 (1993) .............................................. 51

*Gray v. Netherland*, 518 U.S. 152 (1996) ................................................ 31

*Guidry v. Lumpkin*, 2 F.4th 472 (5th Cir. 2021) ............................ 25, 35

*Henry v. Ryan*, 720 F.3d 1073 (9th Cir. 2013) ........................................ 56

*Herod v. State*, No. PD-1564-13 (Tex. Crim. App. Mar. 12, 2014) ......... 18

*Herod v. State*, Nos. 14-12-00645-CR, 14-12-00646-CR (Tex. App.—
    Houston [14th Dist.] Oct. 22, 2013) ..................................................... 17

*Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005) ..................................... 51

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) ...................... 25, 35

*In re Masterson*, 638 F. App'x 320 (5th Cir. 2016) ................................. 23

*In re Raby*, 925 F.3d 749 (5th Cir. 2019) ................................................ 55

*In re Rodriguez*, 885 F.3d 915 (5th Cir. 2018) ................................. 45, 46

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ................................. 61, 62

*Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002) ................................. 60

*Kyles v. Whitley*, 514 U.S. 419 (1995) .............................................. 30, 61

*Langley v. Price*, 926 F.3d 145 (5th Cir. 2019) ...................................... 38

*Martin v. Spradley*, 341 F.2d 89 (5th Cir. 1965) ..................................... 3

*Medellin v. Dretke*, 371 F.3d 270 (5th Cir. 2004) ................................... 50

*Murphy v. Davis*, 901 F.3d 578 (5th Cir. 2018) ...................................... 30

*Napper v. Thaler*, No. 4:10-cv-3550 (S.D. Tex. May 31, 2012) ............... 56

*Napue v. Illinois,* 360 U.S. 264 (1959) ..................................................... 1, 3

*Neal v. Vannoy,* 78 F.4th 775 (5th Cir. 2023) .................................... 38, 39

*Nelson v. Davis*, 952 F.3d 651 (5th Cir. 2020) ........................................ 21

*Nobles v. Johnson,* 127 F.3d 409 (5th Cir. 1997) .................................... 53

*Pierre v. Vannoy,* 891 F.3d 224 (5th Cir. 2018) ..................................... 60

*Prible v. Lumpkin,* 43 F.4th 501 (5th Cir. 2022) ............................... 21, 35

*Pyles v. Johnson,* 136 F.3d 986 (5th Cir. 1998) ..................................... 53

*Rector v. Johnson,* 120 F.3d 551 (5th Cir. 1997) .................................... 31

*Reis-Campos v. Biter*, 832 F.3d 968 (9th Cir. 2016) ......................... 61, 62

*Rose v. Hodges*, 423 U.S. 19 (1975) ....................................................... 39

*Saffle v. Parks*, 494 U.S. 484 (1990) ...................................................... 51

*Shinn v. Ramirez*, 596 U.S. 366 (2022) ............................................ 37, 38

*Smith v. Blackburn,* 785 F.2d 545 (5th Cir. 1986) ................................. 37

*Smith v. Quarterman*, 515 F.3d 392 (5th Cir. 2008) ............................. 25

*Teague v. Lane*, 489 U.S. 288 (1989) ..................................................... 51

*Turner v. United States*, 582 U.S. 313 (2017) ........................................ 50

*United States v. Alverio-Melendez*, 640 F.3d 412 (1st Cir. 2011) ..... 23, 47

*United States v. Bagley*, 473 U.S. 667 (1985) ........................................ 53

*United States v. Bailey*, 123 F.3d 1381 (11th Cir. 1997) ....................... 56

*United States v. Beverly*, 369 F.3d 516 (6th Cir. 2004) ..........................29

*United States v. Brown*, 634 F.2d 819 (5th Cir. 1981)............................60

*United States v. Garvin*, 270 F. App'x. 141 (3d Cir. 2008) ....................23

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) ......................46, 47

*United States v. Nguyen*, 98 F. App'x. 608 (9th Cir. 2004)....................47

*United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002)..........................47

*Wearry v. Cain*, 577 U.S. 385 (2016) ......................................................50

*West v. Johnson*, 92 F.3d 1385 (5th Cir. 1996) ......................................31

*Young v. Herring*, 777 F.2d 198 (5th Cir. 1985) ..................................2, 3

## Statutes

28 U.S.C. § 2254(a)..............................................................................39, 40

28 U.S.C. § 2254(e)(1)...............................................................................22

Tex. Code Crim. Proc. Art. 11.07, § 4......................................................24

## INTRODUCTION

The district court granted habeas relief for two of Plaintiff–Appellee Richard Herod's (Herod) claims. First, it found that the prosecution suppressed the results of newly available DNA test result that used probabilistic protocols for DNA mixtures which did not exist at the time of trial—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Second, it found that the prosecution "knowingly" permitted its DNA expert, Clare Browder, to testify "falsely" in 2012, because her opinion failed to incorporate the changes that DPS made to its DNA mixture protocols in 2015, in violation of *Napue v. Illinois,* 360 U.S. 264 (1959). Remarkably, the district court granted *Napue* relief without also finding that the prosecution subjectively knew that Browder's testimony was "false" at the time of trial. More remarkable, the lower court granted relief without finding that Browder was aware of the supposed "falsity" of her *own* trial testimony. Added to this, the district court disregarded the overwhelming evidence of Herod's guilt by aggressively reweighing that evidence as a "thirteenth juror." This Court should reverse the lower court to prevent a serious injustice to the living victims of Herod's horrific crimes.

1

## JURISDICTIONAL STATEMENT

When he filed his federal habeas petition below, Herod properly invoked the lower court's subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). ROA.11–31; ROA.367–82. On April 3, 2025, the district court entered Final Judgment conditionally *granting* the writ of habeas corpus for one of Herod's nine claims, ROA.981, while explicitly "reserve[ing] judgment on the remaining claims." ROA.917. Defendant–Appellant, Eric Guerrero, Director, TDCJ-CID (Director) filed a timely notice of appeal on April 28, 2025. ROA.984. "Conditional grants of the Great Writ are final judgments within the usual jurisdiction of this court under 28 U.S.C. § 1291." *Edwards v. State of Louisiana*, 496 F.2d 904, 906 (5th Cir. 1974). Moreover, so long as a district court grants habeas relief on at least one claim of a multi-claim federal habeas petition, the rule in *Edwards* applies even if the district court does not finally resolve the other claims. *See Young v. Herring*, 777 F.2d 198, 202 (5th Cir. 1985). This is so "because '[t]he sole purpose of habeas corpus proceedings is to test the validity or legality of the restraint of the petitioner,'" and hence, "an order granting a writ of habeas corpus based on fewer than all the asserted grounds is a final appealable judgment."

2

*Id.* (quoting *Martin v. Spradley*, 341 F.2d 89, 90 (5th Cir. 1965)). Hence, the Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

In Claim 1, Herod contends the State violated the Due Process Clause in two distinct, but related ways. ROA.951–54. Specifically, Herod argues:

(a) A violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and its progeny,[1] where the prosecutor knowingly presented materially "false" testimony at trial, when its DNA expert testified (i) that Herod could not be excluded as a contributor to the DNA mixture found on portions of a white shirt; (ii) that Herod's non-exclusion from the shirt was "the strongest language you could use in a mixture case; and (iii) that "there's no difficulty with the statistics" for calculating DNA mixtures. ROA.416–20.

(b) A violation of *Brady v. Maryland*, 373 U.S. 83 (1963), when the State withheld favorable and material information that (i) Herod was excluded as a contributor to all DNA evidence found at the scene, and (ii) that there were difficulties with interpreting mixture DNA evidence at the time of Herod's trial. ROA.421–28.

After recognizing that both parts of Claim 1 were procedurally defaulted in the State courts, the district court found that Herod established "cause

---

[1] For simplicity, the Director will refer to this false testimony claim as a *Napue* violation.

and prejudice" to overcome that default and proceeded to de novo review. ROA.954–64. The lower court conditionally *granted* the writ of habeas corpus after finding the State violated both *Napue* and *Brady*. ROA.964–981. This was error.

## STATEMENT OF THE CASE

On January 7, 2011, just before midnight, Herod and another man kicked down the door of Alissia and Ronnie Gallagher's home[2] where they lived with their two daughters. Herod's decision to invade Ronnie's home was no accident—Herod and Ronnie had known each other for approximately two and a half years, and Herod intended to rob a large sum of cash from Ronnie. Herod and the other man were armed with pistols and attempted to hide their identity by wearing ski-masks. Herod blindfolded and restrained Ronnie then stole codeine and $500 in cash. Herod also sexually assaulted Alissia at gun point.

---

[2] To distinguish between the two married victims, the Director will refer to Alissia and Ronnie Gallagher by their respective first names.

## I.    Trial Evidence

### A.    In the late evening hours of January 7, 2010, Holly Kelly drove Herod and another man to Ronnie and Alissa's home.

Holly Kelly (Kelly) testified that in the months before the home invasion, she lived together with Herod and their child in a home located in Santa Fe, Texas, where she and Herod sold drugs. ROA.2858–62. Kelly explained that she had previously met the victim Ronnie Gallagher—who Kelly knew as "Ronnie G"—face-to-face at least once during one of the many occasions in which Herod and Ronnie met to discuss drugs. ROA.2858–60, 2875. Indeed, in the "few months" before the home invasion, she had traveled with Herod to Ronnie's home on at least three occasions where Ronnie and Herod would discuss the drug business. ROA.2858–62.

Kelly also explained that about a week before the home invasion, she overheard Herod and his friends (including someone named Nick Salinas), discussing their belief that Ronnie G's drug supplier—who had recently been arrested—asked Ronnie to take possession of "$50,000 and a couple of kilos of drugs." ROA.2890–92. About a week later, on January 7, 2010, at approximately 10:30 to 11:00p.m., Herod suddenly told Kelly to drive both him and Salinas to Texas City using Herod's F-350 King

Ranch diesel truck, and she complied. ROA.2870–74. As they neared Texas City, Herod told Kelly to drive to "Ronnie G's" house. ROA.2875. Kelly knew the way because she had accompanied Herod to Ronnie's house before. *Id*. It took approximately 20-30 minutes to travel from Herod's home to Ronnie's home. ROA.2875.

When they arrived at Ronnie's home, Herod directed Kelly to park his diesel truck a couple of houses down the street and wait for him—which she thought strange. ROA.2876–77. After Kelly parked, she witnessed Herod and Salinas grab two handguns out of a backpack, after which both men put those firearms "into their pants." ROA.2877–78. Herod and Salinas also put "beanies" on their heads. ROA.2879–80. Seeing this, Kelly asked Herod what he was doing, but he told her "to mind [her] business" and both men exited the truck. ROA.2878. About 15 to 20 minutes later, Herod and Salinas returned and reentered the truck. ROA.2884. Kelly described Herod's demeanor as "really anxious," so she asked him "what was wrong" and Herod replied "Nothing. Just drive, drive, drive." ROA.2884–85.

Kelly then drove all three back to Herod's house in Santa Fe, where Kelly witnessed Herod and Salinas split a "few hundred dollars" and a

"couple of pints of codeine," while complaining that "it wasn't worth it[.]" ROA.2888–89.

## B. After Herod and Salinas exited the truck, they invaded the Gallagher's home.

On the evening of January 7, 2010, Alissia and her husband Ronnie were at their home in Galveston County, Texas, with their two daughters. ROA.2273–74, 2283–84. Around 11:00p.m., a friend of Ronnie's came to the house and delivered two bottles of liquid codeine which Ronnie had purchased illegally. ROA.2284–85; ROA.2615–17, 2628. A short time later, at approximately 11:30 p.m., Alissia and Ronnie heard the front door of their home get kicked in and initially assumed that police were conducting a raid due to Ronnie's drug dealing. ROA.2285–88, 2618–23. However, Alissia quickly realized this was not the police when she suddenly encountered a Spanish speaking "Hispanic male" wearing a ski mask and gloves and brandishing a handgun in her living room.[3] ROA.2286–93. The Spanish speaking assailant pointed his gun at Alissia and instructed her to sit down. ROA.2293–94.

---

[3] Alissia distinguished between the two assailants as follows: "Well, the white male was taller; and the Hispanic guy spoke Spanish and English, he had a very big nose, and I could see his skin color was brown." ROA.2298.

Meanwhile, a second masked assailant wearing gloves and brandishing a handgun separately accosted Ronnie in a hallway of the house and eventually forced Ronnie into a bedroom while demanding that Ronnie "[g]ive me your money." ROA.2323–25. Trying to comply, Ronnie opened a safe inside the bedroom closet, but it contained only the liquid codeine delivered earlier that evening and some legal papers. ROA.2626–29. Ronnie then remembered that he had $500 in the pocket of his pants and handed it over to the non-Hispanic assailant under gun point. ROA.2626, 2629. This assailant then "zip tied" Ronnie's hands behind his back, took his wallet, and "blindfolded" him using a white shirt. ROA.2636–38.

While interacting with this masked assailant, Ronnie had an opportunity to closely observe him and soon recognized him as a drug-dealing acquaintance he knew to be "Ricky D." ROA.2830–33. Ronnie's identification was based on Ricky D's "voice and the shape of his body" as well as his very distinctive eyes, which were "real[ly] blue." ROA.2633–34. Ronnie testified that he had known "Ricky D" for approximately two and a half years and that they had met together approximately twenty

times. ROA.2635–36. Ronnie identified "Ricky D" in open court. ROA.2636.

Meanwhile, Alissia, who was with her two daughters in a different part of the house, asked the Hispanic assailant if she could go to Ronnie, and the man then marched her and her daughters to another room where Alissia observed Ronnie on the floor with his hands tied behind his back with "tie straps" and a white shirt covering his eyes. ROA.2292–94, 2297. Alissia now observed the "white" assailant who was wearing a ski mask and carrying a handgun who was taller than the "Hispanic" man who first accosted her. ROA.2297–99, 2803. Alissia never took her eyes off the "white" assailant and his blue eyes. ROA.2298. The blue-eyed assailant then pointed a gun at Alissia's daughters while instructing Alissia to get on the ground before also tying Alissia's hands with "tie straps" behind her back. ROA.2299–2300.

The blue-eyed assailant—who Ronnie knew as "Ricky D"—then marched Alissia to the living room where he threw her on a couch and choked her while demanding to know where the money was. ROA.2307–08, 2310–11. Alissia responded that she didn't know about any money, but the blue-eyed assailant called her a liar. ROA.2311. The blue-eyed

9

man then pulled Alissia's pants and underwear down to her ankles. ROA.2311–12. He then inserted his gloved finger into Alissia's vagina while he was "moaning and making these weird like noises." *Id*. The blue-eyed man also forced Alissia to spread her buttocks while looking "all the way from top to bottom." ROA.2315. This man then picked Alissia up "like a baby" and carried her towards the front door but decided instead to stand her up in the hallway. ROA.2315–16. While carrying her, Alissia begged him not to take her. ROA.2313. At Alissia's urging, the man eventually pulled her pants back up but then threw her on a different couch and began searching through her pockets—again asking where he could find the money. ROA.2316–18.

A short time later, Ricky D took Ronnie into the garage when the blindfold covering Ronnie's face came off. ROA.2639–42. Ricky D responded by kicking Ronnie in the face. ROA.2641–42. Now, for the first time, Ronnie saw the second assailant who he also described as "Hispanic" man based upon the skin color around his eyes and because he spoke Spanish. ROA.2642–43. Ricky D then marched Alissia into the garage at gun point and demanded that she ask Ronnie whether he had given up all the money. ROA.2319–21. When Alissia complied, Ronnie

responded that there was no other money, and that he had given up everything. ROA.2321–22.

The "white" assailant then forced Alissia back into a bedroom where her daughters were located and put her on the bed with the children. ROA.2323–24. The man briefly left the bedroom and returned with Ronnie's cell phone. ROA.2325. While going through Ronnie's cellphone, the "white" assailant asked Alissia her name and demanded that she give him her personal cellphone number, and Alissia complied. ROA.2326. The same man then "lifted up" Alissia's shirt and began rubbing his handgun against her breasts. ROA.2326–27. Alissia told both daughters to close their eyes because she didn't "want them to see . . . [her] being sexually assaulted." ROA.2327–28. The man then pointed the gun at both children and said that if the police got involved "he would snipe them from a mile away." ROA.2368. After Alissia's children confirmed they would not call the police, the "white" assailant looked once more in the closet and then left the room. ROA.2328. When Alissia had not heard anything more for a few minutes, she managed to slip out of the "tie straps." ROA.2328–29. Alissia ran to the garage, cut off Ronnie's ties, then went to a neighbor's house to call police. ROA.2329–31.

The police arrived at the Gallagher's residence where they recovered the white shirt and two zip ties and secured them for later forensic analysis. ROA.2406–21. After telling police that she had been sexually assaulted, Alissia went to a hospital and underwent a sexual assault examination. ROA.2333–35. Ronnie did not initially tell police at the scene that he recognized Ricky D because he was afraid for his family's safety. ROA.2663. However, the next day Ronnie and Alissia were interviewed by Detective Robles at which time Ronnie explained that he recognized Ricky D. ROA.2443–45. Robles testified that Ronnie was "very certain" about this identification. ROA.2244. Ronnie also provided Detective Robles with some of Ricky D's physical descriptors, and further explained that Ricky D lived in Santa Fe, Texas. ROA.2244.

Based on the information provided by Ronnie, Detective Robles contacted the Santa Fe Police Department and received information that "Ricky D" was Herod. ROA.2449–50. Detective Robles then met with Ronnie and Alissia a second time and showed Ronnie a known photograph of Herod who Ronnie identified as the person he knew to be "Ricky D." ROA.2459–60. Robles secured an arrest warrant for Herod. ROA.2470.

### C.    The "white" assailant called Alissia the day after sexually assaulting her.

The day after she was sexually assaulted, Alissia was speaking to her sister on her cellphone around 10-11:00 a.m. when she was alerted to an incoming call. ROA.2339–2340. Upon answering it, Alissia heard a male voice saying: "This is oh [sic] boy from last night." ROA.2341. The male voice also said that he "was going to come back and do it again" and that he was "going to have money in your mailbox." ROA.2342–43. Alissia immediately recognized this man's voice as the "white" assailant who sexually assaulted her the night before. *Id.* Alissia ended the call, but seconds later the same man called her a second time again saying that he was "going to have money in your mailbox." ROA.2343–44. Upon hanging up a second time Alissia immediately called 911 to report the calls. ROA.2344.

### D.    Cellphone evidence corroborates Alissia's testimony that the man who called her also sexually assaulted her the previous day.

Detective Robles learned that Herod had been arrested in Santa Fe on January 28, 2010, while traveling in a diesel truck. ROA.2472–73; ROA.2531–32. Upon obtaining Herod's verbal and written consent to conduct a search, ROA.2477, Robles recovered two cell phones from

13

Herod's truck. ROA. 2485. Later, while in Robles's office, and in Herod's presence, Robles separately used each recovered cellphone to call his own office phone which was equipped with caller identification. ROA.2484–87. After Robles identified the phone numbers for each cellphone, Herod requested their return. ROA.2487–88. Unsure of their evidentiary value, Detective Robles returned both cellphones to Herod who immediately disassembled them and "ate" their respective SIM cards in Robles's presence. ROA.2488. Of note, Kelly testified that the two cellphones recovered from Herod's truck belonged to Herod. ROA.2894–95.

Detective Robles also testified that he obtained records from the cell phone providers for both Alissia's cellphone and one of the phones recovered from Herod's truck. ROA.2494–95. Alissia's phone records confirmed that she received two consecutive incoming calls around 10 a.m. on January 8, 2010, from a phone number corresponding to one of the phones recovered from Herod's truck. ROA.2495–98. Likewise, review of the phone records for the cellphone recovered from Herod's truck confirmed that it made two consecutive outgoing calls to Alissia's phone number around 10:00 a.m., on January 8, 2010. ROA.2500.

Cell phone tower records showed the geographic locations for one of Herod's recovered cellphones. Those records reflected that on January 7, 2010: (1) Herod's phone was in Santa Fe, Texas, from 4:57 p.m. to approximately 8:23 p.m.; (2) likewise, the phone was also in Santa Fe from 10:30 p.m. to approximately 11:00 p.m.; then (3) from 11:11 p.m. until 11:36 p.m., the phone was traveling into Texas City. Then at 12:04 a.m., on January 8, 2010, Herod's cellphone returned to Santa Fe. ROA.2557–63.

## E.    DNA evidence

The Texas Department of Public Safely Crime Laboratory (DPS) performed forensic analysis on the physical evidence collected by police— including known saliva samples from Alissia, Ronnie, and Herod; as well as a sexual assault collection kit, breast swabs taken from Alissia, and a white shirt and two zip ties. ROA.2761–69, 2769–74. At trial, the State called Clare Browder, an analyst with DPS, to testify regarding DNA testing she performed on the items collected from Ronnie's home. Browder testified that—with a single exception—Herod was *excluded* from *all* the tested items, including the zip ties used to bind Ronnie and

Alissia, the "wearer"[4] portions of the white shirt, and the sexual assault kit. ROA.2792–93, 2810–15, 2817–23. The single exception involved a mixture of DNA[5] found on the "body" of the white shirt from which Alissia, Ronnie, and Herod could not be excluded. ROA.2821–23. Specifically, she explained that Herod could not be excluded from 8 out of 16 of the allele locations in the mixture. *Id*. Finally, she explained that given Herod's non-exclusion from 8 of 16 alleles, the statistical probability of selecting an unrelated person at random who could be the contributor was "1 in 87 for Caucasians." *Id*.

The defense called Dr. Melva Ketchum to testify as a DNA expert on Herod's behalf. ROA.2954–55. Although she had not performed a second DNA test, Dr. Ketchum categorically disputed Browder's opinion that Herod could not be excluded from the body of the white shirt. Instead, she opined that Herod was excluded from 13 alleles—where Browder excluded him from only 8. ROA.2992–3010.

---

[4] The "wearer" areas are the neck and armhole portions of the white shirt of the shirt. ROA.2774–75, 2818.

[5] A DNA "mixture" is a profile that includes DNA from more than one person. ROA.2811.

## II.    Procedural History

### A.    Herod is convicted of aggravated sexual assault and aggravated robbery.

On June 12, 2012, a jury convicted Herod of aggravated sexual assault (Alissia) and aggravated robbery (Ronnie)—both offenses alleged to have occurred on January 7, 2010. ROA.1899–02 (aggravated sexual assault); ROA.1342–47 (aggravated robbery). The jury assessed punishment at ninety-nine years imprisonment for each—the sentences to run concurrently. *See* ROA.1883, 1887 (verdict and sentence for aggravated sexual assault); ROA.1326, 1340 (verdict and sentence for aggravated robbery).

### B.    Direct appeal

Herod challenged both judgments of conviction on direct appeal, *see* ROA.3730; however, an intermediate appellate court affirmed them. *Herod v. State*, Nos. 14-12-00645-CR, 14-12-00646-CR, 2013 WL 5760739, at *8 (Tex. App.—Houston [14th Dist.] Oct. 22, 2013, pet. ref'd), ROA.3674. Herod then filed a petition for discretionary review in the Texas Court of Criminal Appeals (TCCA), ROA.3689; but that court refused it, *Herod v. State*, No. PD-1564-13 (Tex. Crim. App. Mar. 12,

2014). Herod did not file a petition for writ of certiorari in the Supreme Court of the United States. *See* ROA.13 (¶9).

### C.    Herod pursues his first state habeas challenge.

In February 2015, Herod filed two state habeas applications—one for each conviction. *See* ROA.3801–85 (aggravated sexual assault); ROA.4112–90 (aggravated robbery).[6] Neither application included Claim 1 or its subparts. *See* ROA.3806–19; ROA.4117–30. In August 2015, the TCCA denied both state habeas applications without written order on the findings of the trial court without a hearing. ROA.3785; ROA.4029.

### D.    Herod files this federal habeas petition below.

Initially proceeding pro se, Herod filed the instant federal habeas petition challenging both convictions in December 2015. ROA.11. Herod raised seven claims but Claim 1 was not one of them. *See* ROA.17–27. In April 2017, before the Director first answered his petition,[7] Herod filed a "Notice of Newly Discovered Evidence" to which he attached copies of: (i)

---

[6] When context requires the Director to provide parallel citations to the separate state habeas record for each conviction, the first citation will always reference the aggravated sexual assault conviction—and the second, the aggravated robbery conviction.

[7] The delay between initial filing and the Director's answer is largely because the district court didn't issue a show cause order for the Director to respond until December 1, 2016. ROA.77.

the results of new DNA mixture analysis that DPS performed and documented in a supplemental DNA report dated February 9, 2017; as well as (ii) a letter dated February 15, 2017, from an attorney appointed under the Texas DNA Mixture Review Project to assist Herod obtain the new DNA mixture calculation.[8] ROA.128–42. More specifically, the attached documents explained that DPS had recalculated the combined probability of inclusion (CPI) for all biological samples originally collected by police that contained a mixture of two or more DNA profiles. ROA.137–42. The new calculations showed that Herod was now *excluded* from the DNA mixture found on the "body" of a white shirt used to blindfold Ronnie during the robbery. ROA.137–38. Citing these documents, Herod filed an unopposed[9] motion to amend his federal petition to add Claim 1—and also asked the district court to grant a stay and abeyance so he could raise the new claims in the state courts. ROA.317–23. In January 2018, the district court granted Herod's motion

---

[8] The Galveston County District Attorney had earlier contacted Herod in a letter dated July 2, 2016, explaining that a newly available DNA mixture analysis had become available, and asking Herod to indicate whether he wanted a recalculation using the enclosed form. ROA.505.

[9] The Director clarified that he did not oppose this motion but reserved all his defenses. *See* ROA.357–58.

19

and stayed the proceedings to permit Herod to return to state court. ROA.360.

### E.  Herod returns to the State courts to file a subsequent state habeas application.

In March 2018, Herod returned to the state courts and filed two subsequent state habeas applications—one for each conviction. *See* ROA.4266–4399; ROA.4902–5035. Citing the new DNA mixture calculation, Herod raised a claim that his due process rights were violated "because the jury was presented false DNA evidence."[10] ROA.4271, 4907. As with Claim 1, this claim had two subparts. First, that the prosecutor knowingly presented "false" testimony at trial, when its DNA expert testified to the effect that "there's no difficulty with the statistics" for calculating DNA mixtures, ROA.4271, 4907—in violation of *Napue*, *see* ROA.4369–70. Second, that the State "suppressed the fact that there were recognized problems with the statistical analysis of DNA mixtures" at the time of trial, ROA.4271, 4907—in violation of *Brady*.

In a detailed, 47-page order, the state habeas trial court entered proposed findings of fact and conclusions of law recommending that the

---

[10] Herod also raised three additional claims, which are not relevant to this appeal. *See* ROA.4273–77.

TCCA deny these claims on their merits. However, the TCCA ultimately declined the recommendation, and instead *dismissed* both state habeas applications as an abuse of the writ pursuant to Article 11.07, §4(a)–(c) of the Texas Code of Criminal Procedure. ROA.4196; ROA.4832; *see Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than its merits).

### F.     Herod returns to federal court

Herod returned to federal court, and after obtaining additional briefing, the district court conditionally granted federal habeas relief for Claim 1. The Director timely appealed and now files this opening brief.

## STANDARD OF REVIEW

"In reviewing a grant of habeas relief," this Court "review[s] issues of law de novo and findings of fact for clear error." *Prible v. Lumpkin*, 43 F.4th 501, 513 (5th Cir. 2022) (citation omitted). "Whether a petitioner has shown cause and prejudice to excuse a procedural default is reviewed de novo." *Id.* (citation omitted). "For claims that are not adjudicated on the merits in the state court," the deferential scheme laid out in 28 U.S.C. § 2254(d) does not apply, and the federal courts "instead apply a de novo standard of review." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020).

However, the powerful constraints in 28 U.S.C. § 2254(e)—which limit review of a state court's factual determinations—apply even when § 2254(d) does not. *See Austin v. Davis*, 876 F.3d 757, 778 & n.196 (5th Cir. 2017). Hence, when reviewing state court fact findings under § 2254(e)(1), "'a determination of a factual issue made by a State court shall be presumed to be correct' and the habeas petitioner bears 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Id*. at 778–79 (quoting 28 U.S.C. § 2254(e)(1)).

## SUMMARY OF THE ARGUMENT

Claim 1 and its subparts were procedurally defaulted below. While the Director conceded that Herod could show "cause" to excuse the default, the Director has always maintained that Herod failed to show "prejudice." Because the evidence of guilt was overwhelming, the district court's finding that Herod established prejudice to overcome the default was wrong.

Alternatively, the *Brady* claim fails because the district court "points to no authority for the proposition that a prosecutor has a duty to turn over subsequently discovered information about a witness related to events that had not yet occurred at the time of trial but would

22

nevertheless, if a time machine were available, be useful to impeach the witness's credibility." *See In re Masterson*, 638 F. App'x 320, 327–28 (5th Cir. 2016). And while it "hardly bears mention, an implicit prerequisite of any *Brady* claim is that favorable, material evidence actually exists." *United States v. Alverio-Melendez*, 640 F.3d 412, 424 (1st Cir. 2011) (quoting *United States v. Garvin*, 270 F. App'x. 141, 144 (3d Cir. 2008)). Moreover, the district court resolved that trial prosecutors committed grievous due process violations without independently confirming that the prosecution actually suppressed—or *could* suppress—the evidence at issue. The *Brady* claim also fails because the evidence of Herod's guilt is overwhelming.

Finally, the *Napue* claim alternatively fails because Browder's testimony was not "false" in 2012; and even if it was somehow false, neither the prosecution team nor Browder knew it was false. Herod's overwhelming evidence of guilt also means the lower court erred when it found materiality.

## ARGUMENT

### I.    Herod's *Napue* and *Brady* Claims Were Procedurally Defaulted in State Court.

Herod admits that his *Napue* and *Brady* claims were procedurally defaulted below but attempted to demonstrate "cause and prejudice" to excuse that default. *See* ROA.428–27. The district court ultimately found that Herod established both "cause and prejudice" before conducting de novo review of these claims. ROA.964.

### A.    The legal standard for procedural default and its exceptions

A federal court "may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017); *accord Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Here, the TCCA explicitly barred Herod's *Napue* and *Brady* claims because he raised them in a subsequent Article 11.07 application and failed to meet the §4 exceptions. *See* ROA.4196; ROA.4832; *see* Tex. Code Crim. Proc. Art. 11.07, §4. This Court has long held that Texas's bar against filing subsequent habeas applications is adequate and independent in federal habeas—and so it is here. *E.g.*, *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995). Accordingly, the

24

federal courts "cannot reach the merits of . . . [Herod's] defaulted claims unless he overcomes the procedural bar." *Guidry v. Lumpkin*, 2 F.4th 472, 486 (5th Cir. 2021).

A petitioner may overcome a procedural default "if he can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation." *Id.* (quotations omitted). The existence of "cause" for a procedural default "'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (quoting *Coleman*, 501 U.S. at 753). Generally, external impediments include "active governmental interference or the reasonable unavailability of the factual or legal basis for the claim." *Id.* To demonstrate actual prejudice, Herod "must show 'not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* (quoting *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008)).

**B.    The Director affected a limited concession of "cause" below.**

The district court ultimately found both cause and prejudice before performing de novo review. ROA.954–64. In doing so, the district court credited the Director's limited concession that "Herod has established cause for his failure to bring the claim in state court earlier."[11] ROA.710. However, the Director has always maintained that Herod failed to show prejudice to excuse these defaults and continues to do so now. *See* ROA.710–16.

**C.    The district court erroneously found prejudice to excuse the default.**

The district court erroneously concluded that the alleged errors worked to Herod's actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. First, the 2011 DNA results and Browder's related testimony had little, if any, effect on the jury's verdict given (i) the overwhelming inculpatory evidence presented against Herod at trial; and (ii) the insignificant and non-discerning nature of Browder's DNA testimony. In other words, absent Browder's

---

[11] The Director will analyze this concession in more detail, *infra*, when analyzing *Brady* suppression.

testimony, the trial evidence overwhelmingly established Herod's guilt. Rather than repeating this evidence here, the Director provides the follow summation.

### 1. The non-DNA direct and circumstantial evidence powerfully establish Herod's guilt.

The State presented direct evidence of Herod's involvement in the home invasion. For instance, Ronnie positively and repeatedly identified "Ricky D" as one of the two assailants. Ronnie's identification was based on his close observation of Herod's voice, body height and shape, and very distinctive blue eyes. ROA.2630–36. Moreover, the evidence at trial established a relational connection and history between Ronnie and Herod based on their multiple previous encounters with each other,[12] which powerfully corroborated this identification.

Kelly's testimony further removed any doubt as to Herod's direct participation in the charged offenses. Kelly provided the jury with Herod's motive to invade Ronnie's home. Her testimony established that

---

[12] At trial, the defense never contested the fact that Ronnie and Herod knew each other. In fact, trial counsel strategically exploited their mutual familiarity during Ronnie's cross-examining to show that Ronnie may have falsely accuse Herod of the home invasion to eliminate a rival and competitor. ROA.2672–75.

she drove Herod to the Gallagher's home seconds before he and Salinas kicked in the door; and she picked him up seconds after he and Salinas left Ronnie's home. Kelly testified about her observations of Herod's anxious demeanor when he reentered the truck, which is consistent with someone who had just participated in an intense home invasion and wanted to leave the area as quickly as possible. Kelly's testimony corroborated many parts of Ronnie and Alissia's testimony concerning the home invasion. For instance, the assailants were described as "white" and "Hispanic" and Kelly confirmed that Herod was Caucasian and Salinas was Hispanic; the assailants were armed with handguns, and Kelly saw Herod and Salinas arming themselves with handguns upon arriving at the Gallagher residence; the assailants got away with cash and codeine, and Kelly observed Herod and Salinas dividing cash and codeine when they returned to Santa Fe; and finally, Ronnie heard a diesel truck leaving his residence when the assailants fled, and Kelly confirmed that she drove away from the Gallagher's home with Herod and Salinas in a diesel truck.

### 2. Browder's DNA testimony was relatively insignificant in establishing Herod's guilt.

In contrast, Browder's DNA testimony was relatively insignificant and unpersuasive to Herod's guilt. To begin, Browder merely averred that Herod could not be *excluded* from the mixture on the shirt. This is a far cry from the extremely high levels of certainty provided by nuclear DNA testing performed on non-mixed DNA samples, which is a test of inclusion because it can identify individuals with high fidelity.[13] Relatedly, Browder explained that the statistical probability of selecting an unrelated person at random who could be the contributor was "1 in 87 for Caucasians" like Herod. ROA.2821–23. Critically, a probability of 1 in 87 does not distinguish Herod from a large segment of the general Caucasian population in 2010.[14] At best, Browder's testimony showed

---

[13] In an analogous context, federal courts have recognized this same distinction with mitochondrial DNA testing. *See United States v. Beverly*, 369 F.3d 516, 529 (6th Cir. 2004) ("mtDNA is not as precise an identifier as nuclear DNA. . . . Because it is not possible to achieve the extremely high level of certainty of identity provided by nuclear DNA, mtDNA typing has been said to be a test of exclusion, rather than one of identification.").

[14] Census data for 2010 shows that the non-Hispanic / non-Latino "white" population comprised 72.4% of the total United States population, which comes to 223,553,265 people. *See* UNITED STATES CENSUS BUREAU, The White Population: 2010, page 3 (Sep. 2011), https://www2.census.gov/library/publications/cen2010/briefs/c2010br-05.pdf. (last visited July 23, 2025). Dividing 233,553,265 by 87 comes to 2,569,577,

that Herod was one of millions who also could not be excluded from the mixture on the white shirt.

## II.  Alternatively, Herod's *Brady* claim is totally without merit.

### A.  Legal test for *Brady*

The Due Process Clause requires the prosecution to disclose material evidence that is favorable to the defense. *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, a petitioner must prove that: "(1) the evidence at issue is favorable to the defense, either because it is exculpatory or impeaching, (2) the prosecution suppressed the evidence, and (3) the evidence is material." *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018). This duty to disclose "extends to all evidence known not just to the prosecutors, but 'to the others acting on the government's behalf in the case, including the police.'" *Floyd v. Vannoy*, 894 F.3d 143, 161-62 (5th Cir. 2018) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

However, the State is under no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in

---

which is roughly the number of people living in the United States in 2010 who shared Herod's allele makeup.

the defendant's possession or can be discovered by exercising due diligence. *Rector v. Johnson*, 120 F.3d 551, 558–59 (5th Cir. 1997). In other words, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known of the essential facts permitting him to take advantage" of that evidence. *Id.* at 560 (quoting *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996)). Nor is the State obligated under *Brady* to disclose evidence that is available from other sources. *Id.* at 559; *cf. Gray v. Netherland*, 518 U.S. 152, 166–67 (1996) (holding that a capital defendant was not entitled to creation of a "notice of evidence rule").

### B.     Herod failed to show the State "suppressed" evidence.

In support of his *Brady* claim, Herod says the State "suppressed" two kinds of "evidence":

> First, the State "failed to turn over that (1) Herod was excluded as a contributor to all DNA evidence found at the scene . . . ." ROA.422.

> Second, the State "(2) failed to turn over that there were indeed difficulties with interpreting mixture DNA evidence at the time of Herod's trial." ROA.422–23.

The strange grammatical structure of these *Brady* claims—in which the transitive verb lacks a concrete, direct object—forecasts Herod's effort to establish a *Brady* violation without ever identifying tangible "evidence"

existing at the time of trial that the State could have suppressed. This ambiguity takes greater focus when comparing Herod's present *Brady* contentions to the arguments he made in the state courts. In state habeas, Herod suggested (in part) that he could "prove a valid *Brady* claim because the prosecution was in possession of *physical* evidence that, instead of proving he was present at the scene of the robbery, actually proved he was not at the scene of the robbery." ROA.4379 (emphasis added). To this, the State answered that Herod failed to "specify what 'physical evidence' the State possessed," and then withheld. ROA.4644. Agreeing with the State, the trial court made a discrete finding of fact "that the State never suppressed any physical evidence or the results from the forensic analyses performed on these items." ROA.4760 (¶69). This finding has significant force because the prosecution provided the defense with the only physical item of DNA evidence that it had at the time of trial, i.e., Browder's DNA report. Perhaps recognizing this, Herod dropped any suggestion that the State possessed and suppressed "*physical*" evidence in his amended § 2254 petition. *See* ROA.422–23. In any event, § 2254(e)(1) powerfully limits review of this determination even when § 2254(d) does not apply. *See*

*Austin*, 876 F.3d at 778 & n.196. The district court did not directly engage this factual determination, and Herod made no effort to rebut it by clear and convincing evidence.

These accusations can never amount to "suppression" by the State both because the newly implemented mixture calculation did not *exist* until years after trial; and because any problems or "difficulties" attendant to Clare Browder's expert trial testimony were equally apparent to both the State and trial counsel before the time of trial.

### 1. The Director did not concede *Brady* suppression below.

When the lower court granted relief, it declined to perform de novo review—or even to conduct *any* review—of *Brady*'s suppression element because it erroneously equated the Director's concession that Herod could establish "cause" as establishing *Brady* suppression. *See* ROA.955 ("The respondent further concedes that Herod has established" favorability and suppression).[15] Although the district court did not further describe the

---

[15] In support of its view, the district court cites "Dkt. 58, at 11-12." *See* ROA.955, 965. This citation refers to two-pages from the Director's supplemental briefing located at ROA.714–15. However, the Director has been unable to locate the concession on those pages. Instead, the district court most likely intended to cite ROA.709–10.

Director's concession, it was likely referring to the following from the

Director's supplemental briefing:

> To show cause, [Herod] must demonstrate that "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." As Herod points out, cause can parallel the first two *Brady* requirements: 1) that evidence favorable to the accused was 2) suppressed by the State, either willfully or inadvertently. Like the defendant in *Stickler* where the Supreme Court determined that the State suppressed documents favorable to the accused for impeachment purposes, *it appears that Herod can meet the first two Brady requirements and can therefore show cause why he did not raise the claim when he filed his first state applications.*
>
> In his subsequent state habeas applications, Herod presented specific allegations and evidence that relevant scientific evidence is currently available which was not available at the time of his trial because this evidence was *unascertainable through the exercise of reasonable diligence.* He has also shown that the DNA evidence was not available until February 9, 2017. Thus, *Herod has established cause for his failure to bring the claim in state court earlier.*

ROA.709–10 (emphasis added) (internal citation omitted). Of note, the

Director's only explicit concession is in the last sentence of the second

paragraph—and it is limited to cause. *See id.*

To support its view that the Director conceded *Brady* suppression,

the lower court identified the well-known parallel between proof of

"suppression" under *Brady*, and proof of "cause" to excuse procedural

default. ROA.956 ("The cause requirement for default aligns with *Brady*'s suppression element. . . .") (citing *Prible*, 43 F.4th at 514). The district court is plainly correct that proof establishing *Brady* suppression can also show cause. *Guidry*, 2 F.4th at 486. However, the district court improperly *reversed* this equivalence, by reasoning that the Director's concession that *cause* existed constituted an admission that the prosecution *suppressed* evidence under *Brady*. This was error.

Again, a cognizable external impediment may be established in two high level ways—either by showing "active governmental interference *or* the reasonable unavailability of the factual or legal basis for the claim." *Hughes*, 530 F.3d at 341 (emphasis added). In other words, the *suppression* of evidence by the prosecution is not the only external impediment that might qualify for cause under *Coleman*. Instead, a petitioner might also show "the reasonable unavailability of the factual or legal basis for the [defaulted] claim." *Id*. Plainly then, if a petitioner can show that some *other* external factor made the claim "reasonably unavailable," he has not automatically shown *Brady suppression*.

Applying this logic here, the Director *explicitly* conceded cause for two categories of "evidence." First, the Director agreed that Herod's

"allegations and evidence that relevant *scientific evidence is currently available* which was *not available at the time of his trial . . .* was *unascertainable through the exercise of reasonable diligence.*" ROA.709. Second, the Director agreed that the 2017 DNA mixture report "was not available until February 9, 2017." ROA.709. But the Director's recognition that the improvements to DNA mixture analysis occurring after Herod's trial were not "reasonably available" to him *at trial*, is a truism. In other words, an acknowledgment that scientific change *happens* does not show, either logically or legally, the Director's agreement that the prosecution team somehow "suppressed" those scientific developments.

To be sure, in the paragraph preceding this limited concession the Director also explained that "it *appears* that Herod can meet the first two *Brady* requirements" which would be sufficient to establish cause under *Coleman.* ROA.709 (emphasis added). But this observation—while poorly articulated—is better understood as expressing a conditional form of the verb "appears" (i.e., hypothetical or uncertain), which was intended to explain why the Director addressed only prejudice under *Coleman.* In other words, this observation is best understood as signaling that the

36

court need not resolve "cause" because (i) the related issues attendant to *Brady* suppression are so thorny; and (ii) because Herod had so obviously failed to show *Coleman* prejudice.

Finally, the district court ignores the live hearing that occurred on April 22, 2024, in which counsel for the Director explicitly argued that Herod could never establish *Brady* suppression—forecasting many of the arguments the Director makes *infra*. ROA.1049–52.

> **2. Even if the Director conceded that the State "suppressed" evidence, it was error for the lower court to grant habeas relief where Herod fails to show *Brady*-suppression as a matter of law.**

In the alternative, it was erroneous for the lower court to skip the *Brady* suppression prong even if the Director erroneously conceded it. "An incorrect admission of error by the state does not bind the district court and it has an *independent duty* to examine the record to ascertain the *accuracy of the stipulation*." *See Smith v. Blackburn*, 785 F.2d 545, 549 (5th Cir. 1986) (emphasis added). This black letter command has special force when conducting federal habeas review of state court convictions. Consider that federal habeas review "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Shinn v. Ramirez*, 596 U.S. 366, 376 (2022). The district

court's order to retry or release Herod imposes special costs on our federal system, including interference with the State's sovereign power to enforce "societal norms through criminal law"; denying finality to the living victims of Herod's violent crime and the sense that they can "move forward knowing" society's "moral judgment will be carried out"; and "inflict[ing] a profound injury to the powerful and legitimate interest in punishing the guilty . . . shared by the State and the victims of crime alike" when those expectations are unsettled. *Id.* at 376–77. Where, as here, the alleged concession goes to an integral element of a constitutional claim—as opposed to a concession affecting only a procedural defense—*Shinn*'s warning has special force.

Moreover, *Smith*'s non-waiver precept finds further support in *Neal v. Vannoy,* where this Court recognized that the State may not waive the mandatory requirements of § 2254(d) because they "constrain" the authority of the federal courts "'to award habeas relief *regardless of what counsel cites or does not cite.*'" 78 F.4th 775 (5th Cir. 2023) (emphasis added) (quoting *Langley v. Price*, 926 F.3d 145, 162 (5th Cir. 2019)). The Court extended this non-waiver principle to state court factfinding under

§ 2254(e)(1) because its text contains the same mandatory limitations on federal court authority to grant the writ. *Id*.

Admittedly, §2254(d) is inapplicable here, but the non-waiver principle should also extend to the mandatory legal requirements found in 28 U.S.C. § 2254(a), which authorize the federal courts to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only on the ground* that he is in custody in violation of the Constitution . . . of the United States." 28 U.S.C. § 2254(a) (emphasis added). Section 2254(a)—like § 2254(d) and (e)(1)—constrains Article III authority to grant habeas relief absent an extant constitutional violation. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is *limited* to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1975) ("A necessary predicate for the granting of federal habeas relief to respondents is a determination by the federal court that their custody violates the Constitution, laws, or treaties of the United States"). Indeed, federal courts have recognized that § 2254(a) functions as an independent limitation to relief. *See Cano v. Williams*, No. 21-1214, 2022 WL 1123081,

39

at *2 (10th Cir. Apr. 15, 2022) ("Often overlooked is that the applicant must also show that he is being held 'in custody in violation of the Constitution or laws or treaties of the United States.' This is a separate requirement for relief.").

In sum, before upsetting Herod's 13-year-old convictions and denying finality to the living victims of Herod's violent crimes, the district court was required to affirmatively decide whether Herod "is in custody in violation of the Constitution . . . of the United States." *See* 28 U.S.C. § 2254(a). This is not just a technical error. The district court resolved that trial prosecutors committed grievous due process violations without independently confirming that the prosecution actually suppressed—or *could* suppress—the evidence at issue. This was error.

> **3. The State could not have "suppressed" evidence of DPS's newly available, post-trial DNA mixture result that excluded Herod as a potential contributor to the white shirt.**

Herod argues that the State failed to turn over "the *fact* that Herod was excluded as a contributor to all DNA evidence found at the scene[.]" ROA.423 (emphasis added). Again, the structure of this sentence, which uses the passive form of the verb, "was excluded," to dissimulate the object suppressed, is a common problem throughout Herod's petition.

Relatedly, Herod's suggestion that the prosecution failed to disclose this "fact" further obscures his *Brady* claim by conflating the interpretive *results* of the respective 2011 and 2017 DNA mixture calculations, with the underlying "truth" about whether his DNA was actually present in the mixture found on the white shirt.

To the extent Herod means to say the State failed to provide the defense with the results of DPS's new DNA report that he received in 2017—which relied on new DNA mixture interpretation guidelines implemented by DPS in August 2015—his claim necessarily fails. "The prosecution has no duty to turn over to the defense evidence that does not exist." *Brogdon v. Blackburn*, 790 F.2d 1164, 1167–68 (5th Cir. 1986); *accord United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005) ("As such evidence did not exist at the time of trial, it was not *Brady* material."); *see also Burgess v. Terry*, 478 F. App'x 597, 600 (11th Cir. 2012) (finding there can be no suppression of evidence that does not exist at the time of trial or sentencing).

Herod does not allege that the State possessed a *second* DNA mixture report at the time of trial which excluded him from the white shirt. Nor does Herod contend that either the prosecution, Browder, and

/ or DPS subjectively *believed* at the time of trial that Herod was *excluded as a contributor to the DNA mixture*. Indeed, Herod fails to explain how anyone might have knowledge about the constituent elements of a DNA mixture without performing a scientific test and interpreting its results. It makes no sense to say that anyone in 2011 could have "known" the "fact" that Herod was excluded as a contributor to the shirt absent the existence of a conflicting DNA report.

> **4.    The State could not have "suppressed" the forensic scientific debate concerning the DNA mixture protocols used at the time of trial by labs throughout the country.**

Herod also suggests the State suppressed favorable evidence "that DPS employees were aware at the time of trial that there was great disagreement in the forensic DNA community about the validity of the mixture interpretation techniques used by DPS." ROA.424. Notably, Herod does not here suggest that the information "suppressed" (i.e., the scientific debate regarding potential inaccuracies in the CPI methodologies used by labs across the country at the time of trial) was somehow controlled by, or limited to, the prosecution team, Browder, or DPS—or even the State of Texas. Indeed, the lead trial prosecutor averred that he was not even *aware* of this forensic scientific debate

regarding DNA mixture analysis in 2011. *See* ROA.4681. Herod's evidence (and argument) conclusively shows that this "disagreement" in the forensic DNA community was widely understood in the criminal justice community before Herod's trial.

For instance, the affidavits attached to Herod's § 2254 petition show that members of the forensic DNA community publicly proclaimed their concerns regarding the analysis of DNA mixtures as early as 2005. *See* ROA.542. In 2006, the International Society of Forensic Genetics formed a DNA Commission to make recommendations on DNA mixture interpretation. ROA.542. In response to these concerns, the National Academy of Sciences created a Scientific Working Group on DNA Analysis Methods (SWGDAM) in 2007 to provide guidance to the interpretation of DNA mixtures. ROA.543. The SWGDAM Guidelines were published in early 2010, and for the next three years members of NIST "began an intensive educational program to teach and implement the SWGDAM Guidelines" in which "they held workshops across the country that were also available online." ROA.545. Also, the "scientific literature in 2011 about DNA interpretation" was promulgated by

"articles promoting and explaining the new mixture interpretation methods." ROA.549. In sum, Herod's supporting affidavits show:

> The forensic DNA community has been aware of substantial variance in mixture interpretation among laboratories since at least 2005 when the National Institute of Standards and Technology ("NIST") first described the issue in an international study called MIX05, Though NIST did not expressly flag which interpretation approaches were considered scientifically acceptable and which were not as a result of the study, it has made significant efforts to improve the integrity and reliability of DNA mixture interpretation through various national training initiatives.

ROA.520. The State could not have suppressed the existence of this very public, *scientific* debate or concerns that DPS had not fully implemented SWGDAM's guidelines for DNA mixtures in 2011. If, as Herod must contend, the "great disagreement in the forensic DNA community about the validity of the mixture interpretation techniques used by DPS" was so well known as to create a presumption that DPS also knew of the debate in 2011,[16] ROA.424, then with diligence, it was equally available

---

[16] To show that DPS suppressed a concrete and knowable "fact" under *Brady*, Herod *must* allege that there was "great disagreement in the forensic DNA community about the validity of the mixture interpretation techniques used by DPS," in 2011. ROA.424. If that debate was not widely known, then it couldn't serve as a universalizing "fact" which DPS might suppress. The same is true for Herod's *Napue* claim. *See* ROA.975 (showing that district court

to trial counsel—and particularly to Herod's testifying defense DNA expert. In any event, the prosecution cannot hide science from the defense.

The outcome here is also controlled by *In re Rodriguez*, 885 F.3d 915 (5th Cir. 2018). Rodriguez had been convicted of capital murder in 2009. *Id.* at 916. At trial, the medical examiner who performed the victim's autopsy, Dr. Natarajan, testified for the State regarding the circumstances and cause of the victim's cause of death. *Id.* at 917–18. Approximately nine-years after trial, "Rodriguez allegedly discovered a 2015 wrongful termination lawsuit involving Dr. Natarajan," *id.* at 917, in which a former employee claimed that Dr. Natarajan "did not perform all of the autopsies and allowed non-certified employees to do much of his work." *Id.* at 918. Citing the lawsuit, Rodriguez filed a post-judgment motion in his federal habeas proceeding claiming—like Herod—that the State violated *Brady* because the "newly discovered evidence shows the

---

relied on the breadth and availability of the debate to conclude that the prosecution somehow "knew" that Browder testified falsely).

Given that the lead trial prosecutor averred that he was not aware of this forensic scientific debate in 2011, *see* ROA.4681, the Director does not stipulate to the truth of Herod's allegations regarding the subjective knowledge of any individual or organization about those "facts" in 2011 or 2012—and specifically reserves the right to dispute them if necessary.

state suppressed evidence of its expert's false and misleading testimony and exculpatory evidence demonstrates Rodriguez's possible innocence of capital murder." *Id.* at 917. This Court firmly rejected this argument because the State could not "suppress" such evidence:

> A final point is that the newly discovered evidence of the *deficient procedures at the medical examiner's office . . .* was *not, contrary to Brady, "suppressed" by the prosecution.* The lawsuit was filed in the public record. The prosecutor had no constitutional duty to inform Rodriguez's counsel of "evidence" that only came into existence years after the conviction.

*Id.* at 919 (emphasis added).

The Fourth Circuit's decision in *United States v. Higgs*, is also on all fours here. *See* 663 F.3d 726, 736–38 (4th Cir. 2011). There, Higgs was convicted of murder and kidnapping in May 2000. *Id.* at 729. At his trial, the government presented Comparative Bullet Lead Analysis (CBLA)— and continued to rely on such evidence until at least 2004. *Id.* at 734, 736. However, forensic scientific debate challenging the accuracy of CBLA began (i) with a report the FBI presented at a conference in 1991, and (ii) a study conducted by the Iowa State University Department of Statistics in May 2000 (collectively the "studies"). *Id.* Four years after Higg's conviction, the National Academy of Sciences released a report in 2004

expressing concerns relating to the interpretation of the results of bullet lead examinations. *Id.* at 737. Higgs alleged a *Brady* violation because the government failed to produce the studies which he might have used to further impeach the CBLA evidence at trial. *Id.* at 734. The court ultimately rejected the *Brady* claim because (i) CBLA evidence was still admitted into evidence at the time of trial; (ii) "the criticisms of CBLA were already present in the public domain at the time of Higgs's trial, even if" the two studies were not; and (iii) "the criticisms of CBLA appear to have been available to trial counsel prior to trial." *Id.* at 738.

In sum, the existence of a forensic scientific debate regarding DNA mixture analysis can never be "suppressed" because the State "is not required . . . to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own." *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002) (internal quotations omitted); *accord Alverio-Melendez*, 640 F.3d at 424 ("The failure to create exculpatory evidence does not constitute a *Brady* violation); *see also United States v. Nguyen*, 98 F. App'x. 608, 609 (9th Cir. 2004) ("*Brady* does not require the government to interview witnesses or otherwise create exculpatory evidence not then in existence.").

**5.    The State could not have "suppressed" evidence that its testifying DNA expert calculated the CPI for the white shirt using a "suspect-driven bias."**

Herod also suggests that the prosecution "suppressed" evidence that the State's DPS analyst based her opinion that Herod could not be excluded from the relevant DNA mixture using loci from Herod's known reference profile—which is critically described as a "suspect-driven bias." ROA.424. But, again, Herod attached several exhibits to his §2254 petition that powerfully vitiate this claim. For example, according to Dr. Bruce Budowle, evidence of Browder's "suspect driven bias" was plainly apparent on the face of her 2011 written report—which both defense counsel and Herod's testifying DNA expert necessarily received prior to trial.[17] *See* ROA.485–86 (Petr's App'x 2). Budowle explains:

> In this case, the DPS analyst provided three different CPI calculations for the same mixture profile from item 3(B) *in the 2011 report*—one for each of the victims (Alissia Gallagher and Ronald Gallagher) and one associated with the suspect (Richard Herod). Only one CPI can be generated for a mixture profile. The generation of three CPIs indicates that the DPS analyst was aware of the possibility of allele drop out as different loci were selected for each CPI statistic. *Calculating three CPIs is an indication of "suspect-driven bias" (using reference profiles to select loci for statistical calculations).*

---

[17] At a pretrial hearing, trial counsel confirmed that he had received the State's DNA report. ROA.1925.

ROA.485–86 (¶11) (emphasis added). Herod also attached an affidavit from Dr. Robert Collins, who confirmed Dr. Budowle's averment that Browder's suspect-driven bias was apparent on the face of her 2011 report. ROA.550 (¶29).

Indeed, the district court favorably cited the state habeas court's related finding "that suspect-driven bias was present in Browder's interpretation of the DNA mixture and her assumption of four contributors[.]" ROA.969 (citing ROA.4757 (¶56)). Because Herod's claim necessarily *depends* on the presence of suspect-driven bias on the face of the 2011 DNA report, he makes no effort to overcome the deference owed this finding under § 2254(e)(1).

Since the 2011 DNA report contained "the essential facts" necessary for trial counsel—and the defense's DNA expert—to identify the presence of suspect-driven bias, the State could not have "suppressed" the information from Herod—full stop. *See Rector*, 120 F.3d at 560.

**D.    The district court erroneously found that Herod established *Brady* materiality.**

Even if Herod could show that the State suppressed evidence, the lower court erred when it found that Herod established *Brady* materiality. *See* ROA.966. "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 582 U.S. 313, 324 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). A petitioner need not show that it was more likely than not a jury would have acquitted him if presented with the suppressed evidence; rather, he must show the undisclosed evidence undermines confidence in the verdict. *Wearry v. Cain*, 577 U.S. 385, 392 (2016). Most critically, where the evidence of a defendant's guilt is "overwhelming," the undisclosed evidence is likely *immaterial. E.g. Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (suppressed evidence was not material "in light of the overwhelming evidence establishing his guilt").

The trial evidence and argument the Director cited above to show there was no *Coleman* prejudice, applies with equal vigor here. In sum, the powerful direct and circumstantial evidence of Herod's guilt,

combined with the relative weaknesses of Browder's DNA testimony, demonstrate that the lower court erred when it found *Brady* materiality.

### E. The district court violated *Teague v. Lane* by fundamentally altering *Brady*'s suppression prong.

The district court radically expanded a prosecutor's disclosure obligations to include both intangible scientific debate and the results of forensic scientific testing obtained years after trial. By fundamentally altering *Brady*, the district court violated the non-retroactivity doctrine established in *Teague v. Lane*, 489 U.S. 288 (1989). *Teague* prohibits the retroactive application of new constitutional rules of criminal procedure on collateral review. *Id*. at 310. Under *Teague*, a new rule is one that breaks new ground, imposes a new obligation on the states or the federal government, or was not dictated by precedent existing at the time the defendant's conviction became final. *See Hughes v. Dretke*, 412 F.3d 582, 590-91 (5th Cir. 2005). Unless reasonable jurists hearing a defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Graham v. Collins*, 506 U.S. 461 (1993) (quoting *Saffle v. Parks*, 494 U.S. 484, 488 (1990)).

## III.  Alternatively, Herod's *Napue* claim is without merit.

In his amended §2254 petition, Herod suggests a violation of the Due Process Clause "because the state secured his conviction though the use of false or highly misleading evidence that was material to the punishment decision." ROA.416. Specifically, Herod suggests that the State's testifying DNA expert—Clare Browder—testified falsely:

1.  When she opined that Herod "could not be excluded as a contributor of the DNA found on the white shirt." ROA.418 (citing ROA.2823–24);

2.  When she opined that her conclusion that Herod could not be excluded from the DNA mixture on the white shirt was "the strongest language you could use in a mixture case." ROA.418 (citing ROA.2844); and,

3.  When she opined: "There's no difficulty with the statistics." ROA.418 (citing ROA.2830).

In its opinion granting relief, the district court agreed that Browder testified "falsely" in each circumstance, and ultimately that Herod was entitled to relief under *Napue*. ROA.966–978. This was error.

### A.  Legal standard under *Napue*

The Due Process Clause of the Fourteenth Amendment forbids the State from knowingly using, or failing to correct, materially false testimony. *See Napue*, 360 U.S. at 269; *see also Giglio v. United States*, 405 U.S. 150, 153–54 (1972). The specific elements require Herod to show

"1) the testimony was *actually* false, 2) the state *knew* it was false, and 3) the testimony was *material*." *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (emphasis added) (quoting *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998)). False testimony is material only when there is a reasonable likelihood that it could have affected the jury's verdict. *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997); *see United States v. Bagley*, 473 U.S. 667, 669 n.9 (1985).

## B.    Herod failed to show that Browder's testimony was actually "false."

The district court found that Browder's testimony was "actually false." COA. ROA.967–72. To do so, the lower court relied exclusively on tangible evidence that came into existence years after trial. First, the new DNA mixture report that DPS issued on February 9, 2017. *See* ROA.967–72 (citing ROA.477–78). Second, Dr. Budowle's affidavit, which is dated January 10, 2019. *See id.* (citing ROA.484–87). Notably, the district court did not find—and the record does not support—that Browder subjectively understood that her own 2011 DNA report (and her related trial testimony) were "false" at the time of trial. *See* ROA.967–72. Indeed, the state habeas trial court made several findings of fact that bear on this issue.

53

For instance, the state court found, "based on a review of the appellate record and the credible affidavit of Bruce Budowle," that Browder's 2011 DNA analysis and resulting trial testimony were both done in accordance with DPS's "DNA mixture interpretation protocols that were adopted in 1999 and remained in effect until 2015." ROA.4756 (¶¶52–53). Second, citing Budowle's affidavit the trial court determined that the Combined Probability of Inclusion method that DPS used at the time of Herod's trial:

> [W]as not scientifically unacceptable; that most laboratories in the United States, including those in Texas, employed the CPI method for the interpretation and statistical analysis of DNA mixture evidence; that the CPI method, which [DPS] used in 2011, "is a valid statistical method conveying the portion of the population that cannot be excluded as a potential contributor of the mixture."

ROA.4756 (quoting ROA.485 (¶10)). Third, the trial court found that Herod failed to present "any allegation or evidence reflecting that Browder intentionally attempted to implicate the applicant or negligently failed to adhere to [DPS's] DNA mixture protocols." ROA.4758 (¶61). Fourth, the trial court found that:

> [A]s "forensic scientists became more aware of the limitations and proper application of the CPI method, [DPS] self-corrected its protocol and implemented a more robust approach regarding how to interpret DNA mixture evidence";

54

> and, that [this self-correction] "is one example of a broader
> evolution among forensic DNA laboratories nationwide with
> respect to DNA mixture interpretation. . . ." which occurred
> after [Herod's] trial.

ROA.4758 (¶¶58-59) (alterations added) (quoting 487 (¶17)). Fifth, the

trial court found that DPS "made the decision not to immediately

implement" SWGDAM's 2010 guidelines "because of a lack of consensus

and differences of opinions among laboratories about the 2010

guidelines." ROA.4761 (¶75). Sixth, the trial court concluded that DPS's

five-year delay in adopting the 2010 SWGDAM guidelines was not

improper, erroneous, or negligent. ROA.4761 (¶76).

These findings establish that despite the scientific debate occurring

between 2010 and 2015, Browder followed DPS's then valid and

applicable procedures for DNA mixture analysis. And while Browder's

opinion that Herod could not be excluded as a contributor to the mixture

found on the white shirt was later shown to be erroneous, it was not false

when given. At most then, the post-trial scientific evidence shows only

that Browder was *mistaken*—not that she was being untruthful.

This Court has rejected *Napue* claims where the relevant witness's

testimony was mistaken rather than intentionally false. *See In re Raby*,

925 F.3d 749, 756 (5th Cir. 2019) (rejecting actual falsity under *Napue*

where "as the state emphasizes, Chu's testimony was probably the result of inadequate training and procedures at the HPD crime lab.") (citing *Napper v. Thaler*, No. 4:10-cv-3550, 2012 WL 1965679, at *35–41 (S.D. Tex. May 31, 2012)). Necessarily then, post-trial proof that a prosecution witness's testimony was mistaken or inaccurate does not show actual falsity under *Napue. See Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013) ("Although Henry has provided evidence rebutting Patterson's version of the facts, he has provided no evidence that Patterson *knew* his testimony was inaccurate at the time he presented it, rather than Patterson's recollection merely being mistaken, inaccurate or rebuttable); *United States v. Bailey*, 123 F.3d 1381, 1395–96 (11th Cir. 1997) (holding that petitioner failed to show actual falsity, and instead "demonstrated nothing more than a memory lapse, unintentional error, or oversight by Agent Hudson.").

### C. The prosecution did not actually known that Browder's testimony was "false."

#### 1. Neither Browder nor the prosecution were aware that that Browder's testimony was "false" at the time of trial.

The lower court did not find that the trial prosecutors had actual knowledge of the alleged falsity of Browder's testimony.[18] Nor did the court find that Browder subjectively understood that her own testimony was false or mistaken at the time of trial. *See* ROA.977 n.23 (rejecting Director's argument that no evidence showed Browder's testimony was either intentionally or negligently false because "Herod's claim does not rely on Browder's personal intent or negligence"). To find otherwise would have required the district court to overcome the deference owed the trial court's numerous factual findings that any inaccuracy in Browder's testimony was unintentional. *See*, *supra*, Section III(B). The district court acknowledged that these state court findings are "presumed correct" under § 2254(e)(1). ROA.976. However, in lieu of showing that Herod rebutted the presumption of correctness owed these findings "by

---

[18] Recall that the lead trial prosecutor averred that he was *not* aware of this forensic scientific debate regarding DNA mixture analysis in 2011. *See* ROA.4681

clear and convincing evidence," the lower court simply ignored them, because "[t]hey do not conflict with this court's conclusion that the *State* knew or should have known in 2012 that" Browder's testimony was false. ROA.976–77 (emphasis added). Thus, to evade the state court's findings, the lower court profoundly alters *Napue*'s legal focus from the prosecution's knowledge of falsity at trial to the "State's" knowledge regarding the potential inaccuracy of Browder's 2012 trial testimony at the highest level of generality—if such a thing can be measured. In other words, the lower court affirmatively assigned knowledge of falsity to only DPS and / or the State and not to any member of the prosecution team, or Browder. *See* ROA. 972–77.

The problem gets worse because Herod did not argue, and the lower court did not find, that DPS possessed concrete evidence at the time of trial that *directly* contradicted Browder's testimony that Herod could not be excluded as a contributor to the mixture on the white shirt. In other words, the lower court did not conclude that some unknown person or group within DPS condensed the high-level scientific concerns surrounding DNA mixture analysis in 2011 to conclude—at the time of trial—that Herod was excluded from the mixture in *this case*. Instead,

the lower court focused on only the existence of the high-level debate to support an inference that the "*State*" should have recognized the potential for probabilistic errors in 2011, *generally*. *See* ROA.975 (arguing that because "DPS was aware in 2012 of concerns regarding potential inaccuracies when using the CPI method on DNA mixtures" so "the State knew or should have known at Herod's trial that Browder's expressed certainty in her statistics was false."). It was error for the district court to find knowledge of falsity where both the prosecution and Browder subjectively lacked it.

      **2.**    **The lower court erroneously determined that the prosecution need not have actual knowledge of falsity.**

When granting relief, the lower court held that Herod need only prove that the prosecution "should have known that . . . [Browder's relevant] testimony was false." *See* ROA.966 (alterations added); *see also* ROA.975 ("Therefore, the State knew or should have known at Herod's trial that Browder's expressed certainty in her statistics was false."). This was erroneous. For decades, this Court has rejected the view that a petitioner need not show that the prosecution—however defined—actually *knew* a given witness's testimony was "false" under *Napue*. *See*

*Pierre v. Vannoy*, 891 F.3d 224, 228 (5th Cir. 2018), *as revised* (June 7, 2018) (rejecting petitioner's argument he need not show the State was subjectively aware testimony was false because petitioner "cannot point to a single case, either from the Supreme Court or our court, to support his argument."); *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) ("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured."); *Black v. Collins*, 962 F.2d 394, 407 (5th Cir. 1992) (observing that Court "has long abided by the standard requiring that for use of perjured testimony to constitute constitutional error, the prosecution must have knowingly used the testimony to obtain a conviction."); *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981) (same). Herod cannot obtain relief unless he can show that *someone* on the prosecution team had actual knowledge of the supposed falsity of Browder's testimony at the time of trial.

> **3.    The district court improperly imputed DPS's alleged knowledge of the falsity of Browder's testimony to the prosecution.**

After finding that knowledge of the scientific debate surrounding DNA mixture analysis resided in only DPS (or the State), the lower court

then attempted to impute DPS's supposed organizational "awareness" of the debate back to the "prosecution." The lower court accomplished this in two ways. First, by observing that "DPS is a state agency and Browder was, at all relevant times, a DPS analyst. Browder and DPS are members of the prosecution team in this case." ROA.972 n.17. Second, the lower court expanded knowledge of falsity *beyond* even DPS when it found "that the *State* knew or should have known in 2012 that *its certainty expressed through Browder*, i.e., that there was no difficulty with her conclusion that Herod could not be excluded based on CPI statistics and known reference profiles, was false." ROA.976–77 (emphasis added). This was plainly erroneous.

First, while the Supreme Court has undoubtedly held that a prosecutor's disclosure obligations under *Brady* encompass evidence "known to . . . others acting on the government's behalf . . . including the police," *Kyles*, 514 U.S. at 437, that Court has never extended this imputation principle to prosecutorial knowledge under *Napue*, *see Reis-Campos v. Biter*, 832 F.3d 968, 977 (9th Cir. 2016). More important, in *Koch v. Puckett*, this Court implicitly rejected *Brady*'s shared knowledge precept to *Napue*'s knowledge of falsity. *See* 907 F.2d 524, 530–31 (5th

61

Cir. 1990). There, Koch raised a *Napue* claim contending "the sheriff and two of his investigators lied at trial as to the inculpatory statements allegedly made by Koch shortly after the shooting[.]" *Id.* at 530. The Court rejected the claim because, "even if we accept as true Koch's allegations of perjured testimony," on the part of the sheriff investigators, "Koch does not allege that the prosecution knew that this testimony was false." *Id.* at 521 (citing cases); *see also Reis-Campos*, 832 F.3d at 937 n.8 (recognizing that both this Court and the Tenth Circuit "have declined to impute the knowledge of a law enforcement officer to the prosecution where there has been an alleged *Napue* violation."). Necessarily then, *Napue*'s knowledge component does not extend beyond the prosecutor's office. *See id.* Moreover, permitting proof of falsity without the prosecution's actual knowledge jettisons the rationale for lowering the standard of proof necessary for a petitioner to show prejudice in the first place. *See Giglio*, 405 U.S. at 153 ("[T]his Court made clear that *deliberate* deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." (emphasis added)).

In sum, by stripping the requirement that the prosecution and Browder possess subjective knowledge regarding the "falsity" of her DNA testimony in 2012, the district court morphed *Napue* into a requirement that the prosecution guarantee the truth or accuracy of all the testimony which it solicits. This was error.

### D.    The district court erroneously found that Herod established *Napue* materiality.

The district court also found that Herod established *Napue* materiality. ROA.977–78. Given the overwhelming evidence of Herod's guilt, this was error. *See*, *supra*, 5–16, 27–29.

### E.    The district court violated *Teague v. Lane* by fundamentally altering *Napue*'s legal framework.

By fundamentally altering *Napue*'s legal framework, the district court also violated *Teague*'s non-retroactivity doctrine. *See*, *supra*, Section II(E).

## CONCLUSION

Because the district court erred when it granted conditional habeas relief for Claim 1, the Director asks this Court to reverse the lower court's judgment, and remand this proceeding for final resolution of Herod's remaining claims.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for
Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

s/ Joseph P. Corcoran
JOSEPH P. CORCORAN*
Deputy Chief,
Criminal Appeals Division
State Bar No. 00793549
    *Counsel of Record

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
Joseph.corcoran@oag.texas.gov

COUNSEL FOR DEFENDANT–APPELLANT

## CERTIFICATE OF SERVICE

I do hereby certify that on July 25, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" (NEF) to all parties.

s/ Joseph P. Corcoran
JOSEPH P. CORCORAN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Rule 32(f), it has 12,809 words.

2.     This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 MSO, in Century Schoolbook font, 14 points.

s/ Joseph P. Corcoran
JOSEPH P. CORCORAN
Assistant Attorney General

65

**ELECTRONIC CASE FILING CERTIFICATIONS**

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

s/ Joseph P. Corcoran
JOSEPH P. CORCORAN
Assistant Attorney General
