Case No. 25-40247

# *In the*
# *United States Court of Appeals*
# *for the Fifth Circuit*

---

RICHARD ANTHONY HEROD,

PLAINTIFF - APPELLEE

V.

ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

DEFENDANT - APPELLANT

---

On Appeal from the United States District Court for the Southern District of Texas, Galveston Division No. 3:15-cv-0338

---

**PETITION FOR REHEARING EN BANC**

---

Jonathan D. Landers
1018 Preston St., Fl. 8
Houston, TX 77002
Tel: (713) 685-5000
Jlanders.law@gmail.com

Attorney for Mr. Herod

## CERTIFICATE OF INTERESTED PERSONS

(1) *Richard Anthony Herod v. Eric Guerrero*, Cause no. 25-40247;

(2) The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. No corporate disclosure statement is required. Fed. R. App. P. 26.1. No known people have a financial interest in the outcome. Fifth Cir. R. 28.2. The Plaintiff/Appellee was represented by undersigned counsel before the state courts and federal district court. He was previously represented by Franz Michael von Hoffmann and Robert H. Hatcher at trial, and Zachary Maloney on direct appeal. Defendant/Appellant was represented by Susan San Miguel and Joseph P. Corcoran before the district court, and Mr. Corcoran continues his representation before this Court.

/s/ Jonathan Landers

Date: June 1, 2026 Jonathan Landers

## INTRODUCTION AND RULE 40(B) STATEMENT

Richard Herod, serving 99-years for aggravated robbery and sexual assault, argues that due process was violated by the prosecution's presentation of false DNA evidence at trial. The jury was told Herod's DNA could not be excluded from that discovered on a key piece of evidence, when, in fact, he was excluded from all DNA found at the scene. In a 64-page opinion, the district court granted habeas relief — addressing only Herod's due process claims while noting additional unaddressed claims raised "concerns about the integrity of his conviction." The court found "the State presented the DNA evidence as sure and unimpeachable" and that "[a]side from the DNA evidence, the State's case against Herod was made up of disputed facts and the testimony of untrustworthy witnesses." ROA.63. In a 10-page opinion the panel reversed — holding the false DNA evidence was not material.

Rehearing should be granted because the panel decision conflicts with decisions of this Court, authoritative decision of the District of Columbia Circuit Court, and with decisions of Supreme Court. *See Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018); *United States v. Ausby*, 916 F.3d 1089 (D.C. Cir. 2019); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Banks v. Dretke*, 540 U.S. 668 (2004); *Glossip v. Oklahoma*, 604 U.S. 226 (2025).

## TABLE OF CONTENTS

Certificate of Interested Persons ........................................................................ i

Introduction and Rule 40(b) Statement.................................................................. ii

Table of Contents ................................................................................................ iii

Table of Authorities ........................................................................................... iv

Issue Meriting En Banc Consideration ....................................................................1

Statement of the Case...............................................................................................1

I. Statement of Facts – ...........................................................................................1

A. Excluding DNA evidence, the State's case is based on disputed facts and untrustworthy witnesses. ..........................................................................1

B. Herod is arrested with Holly Kelly, two cell phones are found in his truck. ………… ..........................................................................................3

C. The false DNA evidence went unimpeached at trial. ...............................5

D. Both Herod and his alleged co-defendant presented alibi defenses. ........8

E. Closings — the prosecution relies upon the false DNA evidence. ..........8

F. Herod is excluded from all DNA collected at the scene. .........................9

II. Procedural History.............................................................................................10

Argument..............................................................................................................11

I. The Panel Misapplied the materiality framework. ...........................................11

A. The Materiality/Prejudice Framework.....................................................11

B. The panel misapplied the materiality framework. ............................ 16

Conclusion ............................................................................................ 19

**CERTIFICATE OF SERVICE** .................................................................... 19

**CERTIFICATE OF COMPLIANCE** .............................................................. 20

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Banks v. Dretke*, 540 U.S. 668 (2004) ............................ ii, 12, 14, 15, 16
*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ............................ ii, 17
*Giglio v. United States*, 405 U.S. 150 (1972) ............................ 12
*Glossip v. Oklahoma*, 604 U.S. 226 (2025) ............................ ii, 13, 14
*Herod v. State*, 2013 WL 5760739 (Tex. App.—Houston, 2013) ............................ 10
*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................ ii, 11, 12, 13, 14, 16, 17
*Maryland v. King*, 133 S.Ct. 1958 (2013) ............................ 18
*Strickler v. Greene*, 527 U.S. 263 (1999) ............................ 12
*Townsend v. Burke*, 334 U.S. 736 (1948) ............................ 11
*United States v. Agurs*, 427 U.S. 97 (1976) ............................ 11
*United States v. Ausby*, 916 F.3d 1089 (D.C. Cir. 2019) ............................ ii, 17
*United States v. Bagley*, 473 U.S. 667 (1985) ............................ 12
*Wearry v. Cain*, 577 U.S. 385 (2016) ............................ 13, 14, 15, 17
*Whack v. State*, 433 Md. 728 (2013) ............................ 18

**<u>Rules</u>**

Fed. R. App. P. 26.1 ............................ i
Fed. R. App. P. 32(a)(5) ............................ 20
Fed. R. App. P. 32(a)(6) ............................ 20

Fed. R. App. P. 32(f) .......... 20
Fed. R. App. P. 40(b) .......... ii, 20
Fifth Cir. R. 28.2 .......... i
Fifth Cir. R. 28.2.1 .......... i

## ISSUE MERITING EN BANC CONSIDERATION

I. Whether the panel properly applied the materiality test established by *Brady*, *Napue,* and their progeny.

## STATEMENT OF THE CASE

### I. STATEMENT OF FACTS –

#### A. Excluding DNA evidence, the State's case is based on disputed facts and untrustworthy witnesses.

On January 7, 2010, two masked men broke into the home of Ronnie and Alissia Gallagher. ROA.922. During the robbery Ronnie was tied up and blind folded with a white t-shirt, and Alissia testified she was sexually assaulted. ROA.922-23. The State alleged Herod and Nick Salinas were responsible. Salinas was never charged. *Id.*

##### 1. The testimony of the Gallaghers.

"Alissia Gallagher testified that Herod. . . threw her on the couch, strangled her so that she was "barely . . . able to talk," asked her repeatedly where the money was, pulled down her pants to her ankles, lifted her legs . . . and penetrated her vagina with his finger." ROA.922. She identified Herod by his blue eyes, although she initially told police that the taller robber (Herod) was wearing a ski mask and sunglasses, a detail she changed at trial. *Id.* The night of the assault, Alissia was

taken to the hospital for a SANE exam where she denied any penetration. There were no physical signs of trauma including choking. The nurse documented a “fake cry.” *Id.*

Alissia is related to Salinas by marriage, although she claimed never to have met him. She identified Salinas as the shorter intruder. ROA.923. The day after the Robbery, Alissia received two calls from a phone number ending in x1537. The caller, who she recognized as the assailant from the night before, told her to leave money in her mailbox or he would come back again. ROA.925.

Ronnie Gallagher knew Herod well, but did not initially identify Herod as one of the intruders. Ronnie was a drug dealer who had previously been convicted of drug offenses, sexual assault, and was on probation for felony possession of a firearm. ROA.923-24. He purchased codeine the day of the robbery; although he had a prescription, this codeine had been purchased from a friend. *Id.*

Ronnie, who previously had an altercation with Herod, identified “Ricky D” as one of the intruders the day after, and provided Detective Robles with his address. ROA.924. Ronnie also directed his mom to provide police with Herod’s full name, photograph, and address. ROA.925-26. Based solely on information from the Gallagher’s, an arrest warrant was obtained for Herod. *Id.*

### B. Herod is arrested with Holly Kelly, two cell phones are found in his truck.

Twenty-one days after the robbery, Herod, his child's mother (Holly Kelly), and his child were stopped by Texas City Police. ROA.926. Holly Kelly was on probation for forgery. ROA.2852-2854. At trial, Kelly admitted she was married to someone else, something she never mentioned to Herod. She also omitted that Herod's name was not on their child's birth certificate. ROA.926-27. During the consensual search of Herod's truck police found clothing (not associated with the crime), and two cell phones, including the x1537 phone. *Id.;* ROA.2474-2483. Kelly testified that she left her cell phone in the truck, suggesting that at least one of the phones was hers. ROA.2925.

At the police station, Detective Robles documented the phone numbers for both phones, and returned the phones to Herod, who he claimed "disassembled both phones and ate the SIM cards" in "a quick motion." ROA.927. This happened in an office with two detectives present, yet detectives omitted the act in the offense report. ROA.927. Herod presented the post-conviction courts with proof that he did not eat the SIM card from the x1537 phone. ROA.927.

The prosecution presented an expert who testified that x1537 phone had generally traveled from Herod's home to the Gallagher's home on the night in

question, but on cross-examination he confirmed the phone could have been anywhere within a four-mile radius of certain cell-towers. ROA.928.

There were unexplained oddities with the x1537 phone. It was registered to Shawn Davis, a person who could not be identified, and had "several unexplained connections with Alissia's phone[:]"

> First, the x1537 phone was set up by someone with the same contact phone number, same address, and same date of birth as the person who set up Alissia's phone. Second, [both phones] were set up within 11 days of each other in October 2009, approximately 2.5 months before the crime.

ROA.928 (citation's omitted). Herod argues that the x1537 phone was in the possession of Kelly, who left her phone in the truck when he was arrested. ROA.928-29.

Holly Kelly testified that she drove Herod and Salinas to and from the Gallagher's house in Herod's truck. ROA.929. Kelly testified pursuant to plea deal, receiving favorable treatment on the aggravated robbery case and her pending motion to revoke probation. ROA.2852-2856. Just two months before the alleged robbery, Kelly made a false allegation of aggravated assault against Herod. She reported that Herod stabbed a mattress over 100-times in front of her and their child. ROA.944. Officer Strickland, who investigated the case, searched the house, and,

"finding no cuts" on any mattress, confirmed Kelly's allegation was false. ROA.944. Kelly was upset because Herod was leaving her. ROA.2941-42. The x1537 phone's account was established the day before Kelly made the false report. ROA.3387.

Other evidence supports that Holly Kelly was testifying falsely. George Sanford was present at trial and willing to testify that he knew the Gallaghers, Herod, and Kelly. He would testify that Kelly left the x1537 phone in Herod's truck at Ronnie's direction, that Ronnie and Kelly were involved in an affair and drug transactions, and that Ronnie and Herod were involved in an altercation in October of 2009. ROA.944-45.

**C. The false DNA evidence went unimpeached at trial.**

In opening statements, discussing the white shirt used to blindfold Ronnie, the prosecutor explained "this defendant's DNA profile was present." ROA.2228. "Browder[, the State's DNA expert,] testified that Herod could not be excluded from the DNA mixture collected from the 'body' of a white shirt used to blindfold Ronnie Gallagher…. Regarding the blindfold, she stated that Herod 'cannot be excluded as a contributor of the [DNA] profile at eight of the 16 locations,' or alleles." ROA.930. Browder testified "the statistical probability of selecting an unrelated person at random who could be the contributor was '1 in 87 for Caucasians….'" ROA.930.

The panel hung its hat on this low statistical probability, ignoring that Browder went to extraordinary lengths to explain this probability away.

Browder falsely testified that she first obtained "a profile from the evidence samples" and then "compare[d] that to the profile from the known samples…." *Id.* at 2794. The State's own expert in post-conviction proceedings explained Browder looked to Herod's DNA profile first, and tailored her interpretation so that he could not be excluded, an error known as suspect driven bias.

Defense counsel tried to highlight the low statistical probability, but Browder argued "[t]hese statistics are based on picking a person at random. It has nothing to do with the amount or sample size that you are picking from." *Id.* at 2827. Browder explained "I only know what DNA profiles I obtained [from the items]." The following exchange took place:

> [Defense]: What I'm saying is the profiles are just probabilities. They don't actually -- they're not like a fingerprint from the standpoint of I can say that this is my fingerprint right here, right?
>
> A. That's not correct.
>
> Q. Okay.
>
> A. DNA profiles are unique to a person. Your DNA profile is unique to you; and excluding identical twins every person's DNA is different.

ROA.2828. She was certain that Herod was included in the DNA mixture to "a reasonable degree of scientific certainty[.]" ROA.2829. She said "[t]here's no difficulty with the statistics. I calculate statistics based on at what location is the known sample included in this profile." ROA.2830.

Browder's testimony directly rebuts the panel's claim that the low statistical probability lessened the impact of the DNA evidence:

> Q. In dealing with the numbers, the statistical numbers that you generate, the larger the number in the pool . . .the more precise that you're onto the right individual; is that correct?
>
> A. That's not correct. The number is how rare is that combination of alleles in this population group.

ROA.2830. She refused to recognize that a higher statistical probability, like one in 4 million "would give you greater certainty." *Id.* at 2835. The statistics don't matter because they only "give weight to an inclusion…." ROA.2834.

On recross examination, Browder explained "cannot be excluded" is the "strongest language" used in a mixture case. ROA.2843.

The defense called Melva Ketchum as a DNA expert. Twice, "[s]he testified that, as Browder had stated, Herod was not excluded from the DNA mixture on the blindfold." ROA.931-32. And again, "on cross-examination, Ketchum … agreed

with the prosecution's conclusion that Herod could not be excluded as a contributor." *Id.* Ketchum's credibility was impeached because she was trained in veterinary medicine, her lab was not accredited, and "she had 'been involved in the DNA quest for Bigfoot for some time' and … had seen 'a Sasquatch' herself." ROA.932.

**D. Both Herod and his alleged co-defendant presented alibi defenses.**

"Herod's mother, stepfather, and brother, all testified that Herod was at his mother's house on the night of the crime…." ROA.932-933. Holly Kelly was also present, but left in a blue or black truck early in the night. *Id.*

Alissia Gallagher testified that Nick Salinas was the second assailant, but he was not charged in the offense. ROA.933. "Salinas chose to testify on Herod's behalf, despite the trial court's admonishment regarding his Fifth Amendment rights. Salinas and his wife, Tava Salinas, both testified that they were together at home on the night of the crime and that Nick Salinas did not leave…." *Id.*

**E. Closings — the prosecution relies upon the false DNA evidence.**

"Herod's counsel argued to the jury that Herod had been framed by the Gallaghers, highlighting the State's witnesses' inconsistent accounts as evidence that the accounts were fabricated." *Id.* "Regarding the DNA, counsel argued that

the '1 in 87' probability statistic was not compelling enough to convict Herod," especially in light of the other inconsistencies, lies, and motivations in this case. ROA.936.

In response, the prosecution relied on the cell phone evidence and the unimpeached DNA evidence. It was explained "[y]ou have to say 'cannot be excluded.' We know [the Gallaghers' DNA cannot be excluded], and we know the defendant's DNA could not be excluded. And that's as much as you can ever say about DNA. The rest are statistics…. And ***DNA is better than a fingerprint. It's your genetic fingerprint. And the defendant's DNA is absolutely right there on that blindfold***." ROA.937. Ketchum's testimony was dismissed, and the prosecutor explained "***The defendant's genetic fingerprint is absolutely on that blindfold.***" ROA.937-38. The DNA evidence was used to support Ronnie Gallagher's testimony and dispute Herod's claim of fabrication. *Id.*

### F. Herod is excluded from all DNA collected at the scene.

After his conviction, Herod repeatedly petitioned for the DNA evidence to be reexamined. Eventually, DPS revealed it had been using questionable DNA mixture interpretation techniques, "and, on February 9, 2017, the DPS issued its supplemental report concluding that Herod was excluded from all DNA evidence in the case." ROA.939. During post-conviction proceedings, the State and Herod's

experts agreed that Browder had been working under a "suspect driven bias." ROA.484-87; 539-550. Using both current and past DNA interpretation techniques Herod is excluded from all DNA evidence. Amazingly, even using the improper technique applied by Browder, Herod was excluded from all DNA evidence. ROA.486.

## II. Procedural History

In June 2012, Herod was convicted of aggravated sexual assault and robbery and sentenced to 99 years. ROA.1342, 1390. His direct appeal and initial state post-conviction applications were denied. *Herod v. State*, 2013 WL 5760739 (Tex. App.—Houston, 2013); ROA.3801, 4112.

Herod then filed the federal proceeding. ROA.11. While the case was pending, DPS reinterpreted prior DNA testing and concluded that Herod was excluded from all DNA evidence in the case. ROA.477-478. Herod amended his federal pleadings and returned to state court. ROA.128, 317, 352, 360. The TCCA denied the second application as an abuse of the writ. ROA.4196.

The district court found that due process was violated by the introduction of false DNA evidence and testimony, reserving judgment on Herod's remaining claims while noting "that full development of [those] claims would pose significant

additional concerns about the integrity of his conviction." ROA.979. The panel reversed, holding that the false DNA evidence was immaterial, and failing to address Herod's argument that the case should be remanded for an evidentiary hearing. App.10.

## ARGUMENT

### I. THE PANEL MISAPPLIED THE MATERIALITY FRAMEWORK.

#### A. The Materiality/Prejudice Framework.

Convictions based upon false information or favorable evidence suppressed by the State violate Due Process of Law.[1] Richard Herod's conviction was based upon false DNA evidence and the State's suppression of evidence calling into question the work of its forensic analyst. The DNA evidence was false at the time of time of trial and continues to be false today.

The Supreme Court explains that a *Brady* claim can be based upon the introduction of false evidence that the prosecution "knew or should have known"

---

[1] *See e.g. Kyles v. Whitley*, 514 U.S. 419, 432 (1995) ("The Prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation….); *Townsend v. Burke*, 334 U.S. 736, 741, (1948) ("[T]his prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result . . . is inconsistent with due process of law[.]").

was false, or the suppression of favorable and material evidence.[2] The constitutional violations flow from the same constitutional requirement that a criminal conviction be compatible "with 'rudimentary demands of justice.'"[3]

In each circumstance, a finding of constitutional error requires a showing of materiality. The materiality inquiry requires a detailed review of all evidence (even that not presented during trial), is not a sufficiency of the evidence test, and is a favorable standard for defendants.[4] The Due Process materiality test mirrors the prejudice prong for cause and prejudice analysis.[5]

In *Kyles,* where the Court considered this Court's application of materiality,[6] the Court emphasized three aspects of materiality which are important here. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the

---

[2] *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Agurs,* 427 U.S. 97 (1976)).

[3] *Giglio v. United States*, 405 U.S. 150, 153 (1972).

[4] *Id.*

[5] *Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes.") (*citing Strickler v. Greene,* 527 U.S. 263, 281–282(1999)).

[6] 514 U.S. at 422.

defendant's acquittal. . ."[7] Instead, the "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial…."[8] A reasonable probability is one which "undermines confidence in the outcome of the trial."[9]

Relying on *Giglio* and *Napue*, the Court states that "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury."[10] In a powerful explanation of the materiality standard, the Court explained that "[g]iven this legal standard, [a petitioner] can prevail even if . . . the undisclosed information may not have affected the jury's verdict."[11] This standard was discussed in *Glossip v. Oklahoma*, 604 U.S. 226 (2025) where, in addition to the "reasonable likelihood" formulation, the Court stated a new trial is warranted

---

[7] *Id.* at 434.

[8] *Id.*

[9] *Id.* (*citing Bagley,* 473 U.S., at 678.)

[10] *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (internal quotations removed).

[11] *Id.* at n.6.

when false testimony "may have had an effect on the outcome of the trial," and added, "[i]n effect, this materiality standard requires 'the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"[12]

The materiality test "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."[13]

In conducting the materiality inquiry, a Court is not limited to facts which were before the jury at trial. In *Weary,* the Court specifically considered evidence presented as part of separate ineffective assistance of counsel claim and which had not been presented at trial.[14] And, in *Glossip,* the Court explained "prejudice analysis requires a 'cumulative evaluation' of all the evidence," even that "before the Court in the form of an independent claim for relief[.]"[15]

---

[12] *Id.* at 626-627.

[13] *Kyles*, 514 U.S. 419, 434–35 (1995).

[14] *Wearry*, 577 U.S. at 390-91 (discussing independent witnesses who could have verified the alibi defense).

[15] *Glossip*, 604 U.S. at 251 (2025) (*citing Kyles*, 514 U.S. at 441).

Courts conducting materiality analysis must also consider how the inclusion of uncorrected false evidence affected the arguments of counsel. For example, in *Banks,* the Court noted that the disclosure of a witness's informant status would have "dampened the prosecution's zeal" in relying on the witness in closing arguments, and highlighted that the prosecution "'left no doubt about the importance the State attached to [the witness's] testimony."[16]

Nor does the fact that the defense, at trial, impeached the prosecution's evidence militate against a finding of materiality. In denying relief in *Banks*, this Court found against materiality because "Banks had impeached [the witness] at trial by bringing out that he had been a police informant in Arkansas, and an unreliable one at that."[17] Yet, the Supreme Court granted relief, finding "one could not plausibly deny the existence of the requisite 'reasonable probability of a different result' had the suppressed information been disclosed to the defense."[18]

---

[16] *Banks*, 540 U.S. at 700.

[17] 540 U.S. at 688.

[18] *Id.* at 703; *see also Wearry*, 577 U.S. at 387 (the witness had already been substantially impeached at trial, admitting he had "changed his account several times").

### B. The panel misapplied the materiality framework.

The panel opinion failed to consider: Ronnie's delayed identification, status as a felon and sex offender, and previous altercation with Herod; That Nick Salinas was never charged—despite being identified by Alissia—and that he also presented an alibi defense; That Alissia's story consistently changed, the SANE exam did not support her testimony that she was violently choked, and the SANE nurse's documentation of a "fake cry[;]" Holly Kelly's favorable treatment, her prior demonstrably false aggravated assault allegation, and that she testified she left her phone in Herod's truck; Buddy Sanford's affidavit supporting Herod's defense; That defense expert Ketchum testified she had *actually seen bigfoot*; or that Browder refused to concede that the low statistical correlation effected that Herod's DNA was present in the DNA mixture. App.6-9. The panel failed to follow the Supreme Court's admonition that reviewing courts must consider all evidence when conducting materiality analysis.

Indeed, the panel did exactly what the Supreme Court forbids: conducting a sufficiency of the evidence test without considering the DNA evidence. App.8 ("The immateriality of the allegedly suppressed evidence and falsified testimony is further explained by the other evidence presented by the state."). The Supreme Court instructs that "[a] defendant need not demonstrate that after discounting the

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."[19] Yet, this demonstration is exactly what the panel required of Herod, a demonstration which was conducted without consideration of most of the evidence favorable to Herod. App.8-9. Finally, unlike the Court in *Banks,* the panel failed to consider that, had jury learned that Herod was excluded from all DNA evidence, the prosecution would not have been able to repeatedly tell the jury, in both opening and closing arguments, that Herod's DNA was present at the scene.

A review of other cases proves the gravity of the panel's error. In *Kyles*, relief was granted despite four eyewitnesses who identified Kyles as the killer and physical evidence found in Kyle's house. The suppressed evidence there was material, in part, because it would have directly undercut parts of the prosecution's closing argument.[20] In *Wearry,* the Court granted relief although the jury already heard strong impeachment of the prosecution's star witness and had rejected Wearry's alibi supported by three witnesses.[21] And in *Floyd v. Vannoy,* this Court found that it would be "an unreasonable application of Supreme Court law" to find the suppressed

---

[19] *Kyles*, 514 U.S. 419, 434–35 (1995).

[20] *Kyle*, 514 U.S. at 453–454.

[21] *Wearry v. Cain*, 577 U.S. at 387–88, 392–93.

forensic evidence immaterial in spite of Floyd's confession to police and incriminating statements to an associate.[22]

The effect of false forensic evidence cannot be doubted, and his highlighted by *United States v. Ausby*, 916 F.3d 1089 (D.C. Cir. 2019). There, the government conceded that its FBI expert's microscopic hair comparison testimony — which identified hairs found on the rape and murder victim as "microscopically identical" to Ausby's — was false. The D.C. Circuit reversed the district court's denial of relief, rejecting the conclusion that the false hair testimony was immaterial given the "overwhelming evidence" against Ausby, holding instead that the hair testimony was the primary evidence directly contradicting Ausby's defense….[23] Here, the DNA evidence directly contradicted Herod's alibi defense.

"DNA is a powerful evidentiary tool and its importance in the courtroom cannot be overstated."[24] The panel opinion failed to properly apply the materiality

---

[22] 894 F.3d 143, 166–67 (5th Cir. 2018).

[23] *Id.* at 1092–95.

[24] *Whack v. State*, 433 Md. 728, 732 (2013) (*citing Maryland v. King,* 133 S.Ct. 1958, 1966 (2013)).

framework, and when the proper framework is applied the only logical conclusion is that the false DNA evidence may have had an effect on the outcome of Herod's trial.

## CONCLUSION

The Court should grant en banc rehearing.

Respectfully submitted,

/s/ Jonathan David Landers
Jonathan Landers
1018 Preston St., Fl. 8
Houston, TX 77002

Jlanders.law@gmail.com

(713) 685-5000 (work)

## CERTIFICATE OF SERVICE

I certify that a copy of this documents was served on all counsel of record via ECF on June 1, 2026.

/s/ Jonathan David Landers
Jonathan Landers

## CERTIFICATE OF COMPLIANCE

1. This brief complies the type-volume limitations of Federal Rule of Appellate Procedure 40(b) because this brief contains 3,889 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2010 in 14-Point Times New Roman font.

Date: June 1, 2026

/s/ Jonathan David Landers
Jonathan Landers

Case No. 25-40247

In the

# United States Court of Appeals
# for the Fifth Circuit

**RICHARD ANTHONY HEROD,**
Plaintiff-Appellee,

v.

**ERIC GUERRERO, DIRECTOR,**
**TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
**CORRECTIONAL INSTITUTIONS DIVISION,**
Defendant-Appellant.

# APPENDIX

Panel Opinion

*Richard Anthony Herod v. Eric Guerrero,*
*No. 25-40247 (5th Cir. 2025)*

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
May 20, 2026
Lyle W. Cayce
Clerk

No. 25-40247

Richard Anthony Herod,

*Plaintiff—Appellee*,

*versus*

Eric Guerrero, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:15-CV-338

Before Richman, Engelhardt, and Wilson, *Circuit Judges*.

Per Curiam:[*]

Appellee Richard Anthony Herod was convicted of aggravated sexual assault and aggravated robbery in Texas state court in 2012. At trial, the prosecution introduced expert testimony interpreting DNA evidence found at the crime scene. The expert testified that Herod could not be excluded as a contributor to the DNA mixture found on one item at the scene—a white

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

t-shirt used to blindfold one of the victims. Several years later, the Texas Department of Public Safety ("DPS") issued a supplementary report stating that Herod was excluded as a contributor to that DNA mixture under updated interpretation protocols. Finding constitutional errors under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), the district court granted Herod federal habeas relief under 28 U.S.C. § 2254. *See Herod v. Guerrero*, No. 15-0338, 2025 WL 1001609 (S.D. Tex. Apr. 3, 2025). We conclude Herod's claims were procedurally defaulted in state court and he has failed to show prejudice to overcome the default. We REVERSE the district court's judgment and REMAND for proceedings on the remainder of Herod's habeas petition.

I.

In January 2010, armed robbers invaded Alissia and Ronnie Gallagher's Texas City home. While inside the home, one of the robbers secured codeine and cash from Ronnie, bound his hands with zip ties, blindfolded him with a white t-shirt, and then proceeded to sexually assault Alissia in view of the couple's two children. In addition to other evidence, the state introduced expert DNA testimony at trial. Clare Browder, a DPS analyst, testified that Herod was excluded as a contributor to DNA mixtures found on almost all the physical evidence left at the scene. For the white t-shirt, Browder opined that Herod could not be excluded as a contributor. The defense called its own expert, who agreed that Herod could not be excluded (as a technical matter) from the DNA mixture found on the t-shirt.[1]

[1] The defense's expert, Melva Ketchum, also testified that Herod "should be excluded." Herod emphasizes that her testimony was impeached by her training in veterinary medicine, running of an unaccredited laboratory, and involvement "in the DNA quest for Bigfoot."

The jury convicted Herod of aggravated robbery and aggravated sexual assault. *Herod*, 2025 WL 1001609, at *1. Sentenced to 99 years in prison, Herod appealed his conviction and sentence through the state court system. *Id.* He then filed an initial state habeas petition in February 2015, which was denied by both the state trial court and the Texas Court of Criminal Appeals ("CCA"). *Id.*

Herod filed his first federal habeas petition in December 2015. *Id.* While that petition was pending, Herod received a letter from the state district attorney instructing that recalculation of DNA evidence was available in his case. DPS issued a supplemental report in 2017, explaining that Herod was excluded from all DNA evidence, including the mixture on the white t-shirt. The district court stayed proceedings so Herod could file a second state habeas petition asserting claims based on the DPS report. *Id.* The state trial court entered findings of fact and conclusions of law rejecting Herod's claims, and the CCA dismissed the application on procedural grounds. *Id.*

In January 2020, Herod returned to federal court with an amended habeas petition, raising nine claims for relief. *Id.* at *2. Herod's first claim alleged due process violations, encompassing both *Brady* and *Napue* arguments. He asserted that the state suppressed (1) the fact that Herod was excluded as a contributor to the DNA on the white t-shirt; and (2) the existence of scientific debate surrounding the state's method of DNA mixture interpretation. He likewise asserted the state's expert—Browder—falsely testified that "Herod could not be excluded as a contributor of the DNA found on the white shirt," this was "the strongest language you could use in a mixture case," and "[t]here's no difficulty with the statistics."

The district court concluded that Herod had overcome the procedural default of his *Brady* and *Napue* claims. It reached the merits, holding Herod

was entitled to § 2254 relief on both fronts. *Id.* at *22, 27. "In reviewing a grant of habeas relief, we review issues of law *de novo* and findings of fact for clear error." *Prible v. Lumpkin*, 43 F.4th 501, 513 (5th Cir. 2022). And we apply "the same standards to the state court's decision as did the district court." *Grace v. Hooper*, 123 F.4th 800, 804 (5th Cir. 2024) (citation modified).

## II.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the federal courts "shall entertain an application for a writ of habeas corpus" for a person in custody under a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). AEDPA ordinarily requires highly deferential review of the state court's habeas decision. *See id.* § 2254(d). These deferential review standards do not apply, though, when the claims were "not adjudicated on the merits in the state court." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (citation modified). In that case—a procedural default—federal courts cannot review the claims "absent a showing of cause and prejudice to excuse the default." *Prible*, 43 F.4th at 513.

Cause is "some objective factor external to the defense" that "impeded counsel's efforts to raise the claim in state court." *Id.* at 513 (quoting *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014)). Prejudice means that "the errors 'worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 514 (quoting *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008)). The "possibility of prejudice" is insufficient. *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (citation modified). A petitioner must show "pervasive actual prejudice," meaning that he "was

denied fundamental fairness at trial." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (citation modified). *Brady* violations "can provide cause and prejudice" to excuse the procedural bar. *Prible*, 43 F.4th at 514 (citation modified). *Brady*'s suppression element tracks cause, while its materiality element tracks prejudice. *Id.*

The parties here agree that Herod's claims are procedurally defaulted. After all, the CCA dismissed Herod's second habeas petition on state procedural grounds. *See Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (en banc) ("In our writ jurisprudence, a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits."). And at all stages of this case, the government has conceded cause. Prejudice, however, it vigorously disputes. The district court ultimately agreed with Herod, concluding "Browder's false testimony . . . worked to Herod's actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Herod*, 2025 WL 1001609, at *21. We review the district court's cause-and-prejudice conclusion *de novo*. *Prible*, 43 F.4th at 513.

Recall that Herod's due process claim is premised on *Brady* and *Napue* violations. To assess whether the purportedly suppressed evidence and false testimony affronted procedural fairness, an outline of the trial evidence is in order. We evaluate the materiality of allegedly suppressed evidence "collectively, not item by item." *Floyd v. Vannoy*, 894 F.3d 143, 162 (5th Cir. 2018) (per curiam) (citation modified) (assessing *Brady* materiality). This is "not a sufficiency of the evidence test." *United States v. Brumfield*, 89 F.4th 506, 516 (5th Cir. 2023) (citation modified). Instead, we question whether Herod "received a fair trial"—one "resulting in a verdict worthy of confidence in the absence of the favorable evidence." *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011) (citation modified).

In its opening statement, the prosecution explained that the jury would hear "that [Herod's] DNA profile was present" on the white t-shirt used to blindfold Ronnie Gallagher. But that is not what the jury ultimately heard. Browder testified that Herod was excluded as a contributor to all but the white t-shirt. He "could not [be] exclude[d]" from the t-shirt's DNA mixture. On cross-examination, Browder testified that she could not "give . . . certainty" to any inclusion of one person within a mixture of DNA. She clarified on redirect, however, that Herod's non-exclusion was the "strongest language" she could use. Browder never testified that Herod's DNA was on the white t-shirt.

Despite Herod's non-exclusion, Browder testified to the "probability that you could pick up [a person] with that combination of alleles" as 1 in 87 Caucasians. She explained that the higher the second number, the "less frequent allele combination." Approximately 1 in 87 Caucasians would have the allele combination from which Herod could not be excluded. By comparison, Ronnie—who wore the t-shirt blindfold—could not be excluded at 14 of 16 locations on the body of the white t-shirt. For his allele combination, the probabilities of selecting a person at random who could be the contributor were 1 in 9.843 million for Caucasians, 1 in 102.5 million for African Americans, and 1 in 1.786 million for Hispanics.

The defense expert then cast some doubt on Herod's non-exclusion. Ketchum testified that Herod could "[t]echnically" not "be excluded from eight" of 16 allele markers. But she "[r]ealistically" felt "he should be excluded" from the t-shirt, given that he was excluded at the remaining eight markers. She further explained that he should have been excluded at five additional markers, given that some of the alleles were shared by Herod and the victims and other alleles were commonly found in large portions of the world population. Ketchum also emphasized the presence of an unknown contributor in the DNA mixture—it was four contributors, not three.

In closing, the prosecutor argued "we know the defendant's DNA could not be excluded. And that's as much as you can ever say about DNA. The rest are statistics." The prosecutor also argued that "DNA is better than a fingerprint. It's your genetic fingerprint. And the defendant's DNA is absolutely right there on that blindfold." The defense closing argument, though, undercut the weight of the DNA testimony. It urged the jury to consider Ketchum's expert testimony that, in her opinion, Herod's non-exclusion should only have extended to three, not eight, allele markers. Defense counsel also explained the possibility that the DNA was contributed by an African American or Hispanic male, while Herod was Caucasian—there was a further "chance of error." As the defense attorney noted, Browder testified to "a 1 in 87 chance" of another Caucasian person "being able to contribute this DNA." All in all, defense counsel emphasized, "even at the State's numbers," Herod was a risky bet, given that relatively high probability.

Disclosing the "fact" that Herod was actually excluded as a contributor to the mixture on the white t-shirt, the existence of scientific debate surrounding Browder's DNA interpretation methods, and that perhaps there was some "difficulty with the statistics" could not reasonably have moved the jury's needle. The jury had heard already from the defense expert that—setting aside technicalities—Herod should have been excluded from the DNA mixture. The jury had heard the defense expert cast doubt on Browder's statistics by highlighting that there was an unknown contributor to the sample. And the jury had heard that, for the single piece of evidence from which Herod could not be excluded, the allele combination probably could be found in 1 in 87 Caucasians. In other words, the chances that Herod contributed DNA to the mixture were a long shot. We independently agree with the state habeas trial court's conclusion that Herod

was "only minimally connected" to "the white shirt," even under the allegedly erroneous evidence.

The immateriality of the allegedly suppressed evidence and falsified testimony is further explained by the other evidence presented by the state. *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." (citation modified)). At trial, Ronnie identified Herod as one of the robbers, and Alissia identified the "white male" as her assailant. Herod's girlfriend, Holly Kelly, testified for the prosecution, explaining that she drove Herod and another individual from Santa Fe, Texas, to Texas City, Texas, on the night of the crime, watched them take "beanies" and handguns out of the vehicle, and return later with codeine and several hundred dollars in cash. For his part, Herod introduced alibi testimony from his mother, stepfather, and brother. He was at his mother's home on the night of the crime watching the college football national championship. The defense also emphasized inconsistencies in the testimony elicited by the prosecution, including information the Gallaghers withheld in their original statements to police.

Importantly, cell phone evidence also tied Herod to the crime. Kelly testified that Herod had multiple phones around the time of the incident. To be sure, two phones were found in the truck that Herod was driving on the day of his arrest, although Kelly testified that she had left her cell phone in the vehicle as well. Alissia testified that she received two calls the morning after the crime, identifying the voice on the other end as her assailant's—the "white robber." After recovering the phones from Herod's truck, a Texas City Police detective discovered one of those phones had called Alissia at her reported time, confirmed by records from the cell provider. The phone that

called Alissia was not registered in Herod's name.[2] Cell tower records reflected that one of the phones was in Santa Fe on the night of the crime until around 11:00 P.M. That phone then traveled from Santa Fe to Texas City, returning to Santa Fe around 12:00 A.M. The timing of the phone's travel between the cities aligns with the timing of the crime at the Gallaghers' Texas City home and Kelly's testimony about driving Herod from Santa Fe to Texas City.

Contrary to the district court's analysis, we conclude there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Miller v. Dretke*, 404 F.3d 908, 914 (5th Cir. 2005) (citation modified) (concerning *Brady* materiality). Although the defense challenged the state's other evidence of guilt, the allegedly suppressed evidence and falsified testimony does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The DNA evidence had limited import—which was further reduced by Ketchum's testimony and defense counsel's closing argument. Neither the allegedly suppressed scientific evidence (supporting Herod's *Brady* claim) nor Browder's allegedly false DNA-related testimony (supporting Herod's *Napue* claim) infected Herod's "entire trial with error of constitutional dimensions." *See Prible*, 43 F.4th at 514 (explaining petitioner's burden to overcome

---

[2] Herod and the district court both emphasized oddities with the cell phones. *See Herod*, 2025 WL 1001609, at *5. The phone that called Alissia was registered just 11 days after Alissia's phone registration, to someone listing the same address (a California P.O. box), with the same account holder birthday (02/19/1991), and the same recovery phone number. Some of this information was not presented to the jury—and therefore is part of the basis for Herod's ineffective assistance of counsel claims. *See id.* at *20 ("Although not presented by Herod's counsel, evidence in the trial record showed that the x1537 phone had multiple unexplained similarities to Alissia Gallagher's phone.").

procedural default). Herod has not shown prejudice sufficient to overcome the procedural bar.

* * *

We REVERSE the district court's grant of 28 U.S.C. § 2254 habeas relief premised on Herod's *Brady* and *Napue* claims and REMAND for proceedings consistent with this opinion.

Kurt D. Engelhardt, *Circuit Judge*, joined by Wilson, *Circuit Judge*, concurring:

I agree entirely with the majority opinion. I write separately to emphasize another reason why one of Herod's *Brady* arguments fails. Even if Herod had overcome the procedural default, one of his claims is barred by the non-retroactivity principle in *Teague v. Lane*, 489 U.S. 288 (1989).

* * *

*Teague* prohibits federal habeas courts from applying "new constitutional rules of criminal procedure" to convictions and sentences finalized "before the new rules are announced." 489 U.S. at 310. This non-retroactivity rule, much like the procedural default bar, is a "threshold question in every habeas case." *Matthew v. Johnson*, 201 F.3d 353, 358–59 (5th Cir. 2000) (citation modified); *Lambrix v. Singletary*, 520 U.S. 518, 524 (1997) (recognizing that *Teague*-bar analysis may follow procedural-bar analysis but precedes the merits). Courts must assess "whether granting [petitioner] the relief he seeks would *create* a new rule of constitutional law." *Graham v. Collins*, 506 U.S. 461, 466 (1993) (emphasis added) (citation modified); *id.* at 467 ("New rules will not be applied or *announced* in cases on collateral review unless they fall into one of two exceptions." (emphasis added) (citation modified)).

The *Teague* analysis, largely unaddressed in the parties' briefing,[1] proceeds in three steps: First, identifying the date on which Herod's

[1] The state raised *Teague* for the first time on appeal. Herod asks the court to deem any *Teague* arguments waived. True, the state "may waive the *Teague* bar implicitly by failing to raise it." *Blakenship v. Johnson*, 118 F.3d 312, 316 (5th Cir. 1997) (recognizing that *Teague* is not an unwaivable jurisdictional doctrine). But "absent compelling reasons to the contrary," the court must "apply *Teague* even when it has been implicitly waived by the State" by raising it anew on appeal. *Jackson v. Johnson*, 217 F.3d 360, 361 (5th Cir. 2000); *Jones v. Davis*, 890 F.3d 559, 564 (5th Cir. 2018). Herod has provided no compelling

conviction and sentence were finalized. *Matthew*, 201 F.3d at 359. Second, "surveying the legal landscape as it then existed" and assessing whether the "rule he seeks was required by the Constitution" at the time. *Id.* (citation modified). And, third, if a new rule is needed, whether it falls within either of two narrow exceptions to *Teague*'s non-retroactivity bar. *Id.*

I.

A "conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). Herod's conviction and sentence were finalized in June 2014. *Herod v. Guerrero*, No. 15-0338, 2025 WL 1001609, at *1 (S.D. Tex. Apr. 3, 2025) (district court explaining that Texas Court of Criminal Appeals denied Herod's petition for discretionary review on March 12, 2014); SUP. CT. R. 13 (requiring petitions for certiorari in criminal cases to be filed within 90 days of state court order denying discretionary review).

II.

An assessment of the legal landscape in June 2014 reveals that Herod's *Brady*-based relief partially requires new constitutional rules. For one of his *Brady* claims, "it would have been anything but clear to reasonable jurists" that Herod's trial violated the Constitution, as he alleges. *Graham*, 506 U.S. at 468. New rules "break[] new ground, impose[] a new obligation on the states or the federal government, or [were] not dictated by precedent existing at the time the defendant's conviction became final." *Hughes v. Dretke*, 412 F.3d 582, 591 (5th Cir. 2005). "Dictated by precedent means

reasons not to assess *Teague* and asserted at oral argument only that his claims break no new constitutional ground.

that no other interpretation was reasonable." *United States v. London*, 937 F.3d 502, 507 (5th Cir. 2019) (citation modified); *Lambrix*, 520 U.S. at 538. "Unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review." *Hughes*, 412 F.3d at 591. Note, however, that "when all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule for *Teague* purposes." *Chaidez v. United States*, 568 U.S. 342, 348 (2013).

Herod's *Brady* arguments allege the prosecution's failure to disclose impeachment evidence. Prosecutorial disclosure obligations for exculpatory evidence have existed since at least the 1960s. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). And the rule has long extended to impeachment material as well. *See Matthew*, 201 F.3d at 360 (first citing *United States v. Bagley*, 473 U.S. 667, 676 (1985); and then citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). For decades, three elements have made up a *Brady* violation: "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or punishment." *Cobb v. Thaler*, 682 F.3d 364, 377 (5th Cir. 2012) (internal quotation marks and citation omitted). Herod argues the state failed to disclose (1) the fact that Herod was excluded as a DNA contributor to the white t-shirt and (2) scientific debate surrounding the state's DNA mixture interpretation method.

*Brady* would not require the state to disclose a fact that it had no knowledge of at the time of trial. No evidence showed Herod's exclusion until 2017, when the state reevaluated the DNA mixture using updated interpretation protocols. Herod does not identify a single person or document, from before or during trial, that suggests the prosecution knew or believed Herod was excluded as a contributor. "*Brady* claims involve the

discovery, after trial, of information which had been *known* to the prosecution but unknown to the defense." *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) (emphasis added) (citation modified); *see also* Caitlin Plummer & Imran Syed, *"Shifted Science" and Post-Conviction Relief*, 8 STAN. J. C.R. & C.L. 259, 285 (2012) (recognizing that *Brady* claim necessarily fails in "the case of true shifted science" because "a prosecutor cannot disclose something that she does not know and cannot be expected to know"). Herod cites no authority suggesting that the prosecution suppresses a fact absent evidence the prosecution even knew about it. The court would "have to extend *Brady* beyond what is compelled by existing precedent" to rule in Herod's favor. *West*, 92 F.3d at 1399. Therefore, relief is "barred by *Teague*." *Id.*

Herod's other *Brady* argument—that the state suppressed scientific debate surrounding its chosen DNA mixture interpretation method—is likely not barred by *Teague*. Herod asks the court to conclude this was not the type of information that was "in the public domain" at the time of trial, such that it was equally available to the defense. "Evidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it." *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002) (citation modified); *id.* (explaining prosecution need not "facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own" (citation modified)). I doubt relief would be warranted on the merits of this *Brady* argument.[2] But Herod

[2] Although some cases explain that if "reasonable minds could differ on whether the current law requires relief, we may not grant relief without creating a 'new rule' barred by *Teague*," *Vega v. Johnson*, 149 F.3d 354, 357 (5th Cir. 1998), the Supreme Court has clarified that *Teague* is separate from a merits analysis, *see Lambrix*, 520 U.S. at 524. Necessarily, then, failure on the merits cannot automatically make such a claim *Teague*-

merely asks the court to apply rules of "general application," "designed for the specific purpose of evaluating a myriad of factual contexts." *Chaidez*, 568 U.S. at 348 (citation modified). Legal principles from those cases "speak directly" to the issues he raises. *See Saffle v. Parks*, 494 U.S. 484, 490 (1990) (addressing situation where the existing cases did not "speak directly, if at all, to the issue presented"). The starting point of Herod's argument is "a rule of general application," so it likely is not "so novel that it forges a new rule." *Chaidez*, 568 U.S. at 348 (internal quotation marks and citation omitted). *But see Graham*, 506 U.S. at 477 ("We cannot say that all reasonable jurists would have deemed themselves compelled to accept Graham's claim in 1984. . . . The ruling Graham seeks, therefore, would be a 'new rule' under *Teague*.").

III.

Two exceptions permit the court to apply new rules to old convictions, but neither aids Herod here.

"The first exception applies to those rules that place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Gilmore v. Taylor*, 508 U.S. 333, 345 (1993) (citation modified). This encompasses rules that decriminalize classes of conduct or prohibit types of punishment for groups of people. *See Saffle*, 494 U.S. at 495. That is plainly not the situation presented here.

The second exception "permits the retroactive application of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Gilmore*, 508 U.S. at 345 (citation modified). This exception encompasses only a "*small core* of rules requiring

---

barred. Articulating *Teague*'s precise contours in a situation like this, however, is an academic exercise beyond the purview of this concurrence.

observance of those procedures" that are "implicit in the concept of ordered liberty." *Id.* (emphasis added) (citation modified). The Supreme Court has limited this exception to "those new procedures without which the likelihood of an accurate conviction is seriously diminished," *Matthew*, 201 F.3d at 369 (quoting *Teague*, 489 U.S. at 313), and that "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding," *Whorton v. Bockting*, 549 U.S. 406, 418 (2007) (citation modified). "Although the precise contours of this exception may be difficult to discern," the paradigmatic example is the rule from *Gideon v. Wainwright*, 372 U.S. 335 (1963), guaranteeing representation of counsel in criminal trials. *Saffle*, 494 U.S. at 495. "When a defendant who wishes to be represented by counsel is denied representation, . . . the risk of an unreliable verdict is intolerably high." *Whorton*, 549 U.S. at 419. Even if valid, the new *Brady* rule that Herod asks the court to employ has "none of the primacy and centrality of the rule adopted in *Gideon*." *Saffle*, 494 U.S. at 495; *Edwards v. Vannoy*, 593 U.S. 255, 264 (2021) (noting that the Supreme Court has "*never* found that any new procedural rule" satisfies the second exception). Neither *Teague* exception applies.

* * *

I concur in the panel opinion's conclusion that Herod has failed to show prejudice to overcome the procedural default. But even if he had shown prejudice, one of his *Brady* arguments requires the court to break new constitutional ground. The federal courts are barred from doing so on collateral review.